2014 OK CIV APP 57

Roy D. NELSON and Susan E. Ryan,
Plaintiffs/Appellants,

v.

AMERICAN HOMETOWN PUBLISHING,
INC., a foreign corporation; and American Hometown Publishing, Inc., a foreign corporation, d/b/a Guthrie News
Leader, Defendants/Appellees.

No. 111193.

Court of Civil Appeals of Oklahoma,
Division No. 4.

Feb. 24, 2014.

Certiorari Denied May 19, 2014.

964

Thomas A. Ryan, Thomas A. Ryan, PLLC, Oklahoma City, Oklahoma, for Plaintiffs/Appellants.

S. Douglas Dodd, Jon E. Brightmire, Amanda L. Thrash, Doerner, Saunders, Daniel & Anderson, L.L.P., Tulsa, Oklahoma, for Defendants/Appellees.

JANE P. WISEMAN, Presiding Judge.

¶1 Roy D. Nelson and Susan E. Ryan appeal from a trial court order granting summary judgment in favor of American Hometown Publishing, Inc., and American Hometown Publishing, Inc., d/b/a Guthrie News Leader. The issue appealed is whether the trial court erred in granting Defendants judgment as a matter of law. This appeal stands submitted pursuant to Supreme Court Rule 1.36, 12 O.S.2011, ch. 15, app.1, without appellate briefing. After *de novo* review of the record and applicable law, we affirm in part and reverse in part the trial court decision and remand for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

¶2 On May 17, 2010, Nelson and Ryan (collectively, Plaintiffs) filed a lawsuit against Newspaper Holdings, Inc., d/b/a/ Guthrie News Leader, asserting claims for negligence, libel, and punitive damages arising from publication of an incorrect listing of Plaintiffs' home address as the address of a registered sex offender. Plaintiffs filed an amended petition on June 14, 2010, naming as defendants Newspaper Holdings, Inc., a foreign corporation, d/b/a Guthrie News Leader, American Hometown Publishing, Inc., a foreign corporation, and American Hometown Publishing, Inc., a foreign corporation, d/b/a Guthrie News Leader (collectively, Defendants).

¶3 Stating that they live at 9051 West College Avenue, Guthrie, Oklahoma, Plaintiffs allege:

That on or about June 14, 2009, the Defendants ... published a list of sex offenders registered in Logan County in the local newspaper, Guthrie News Leader. The list incorrectly listed the Plaintiffs' address as that of a registered sex offender named Donald Joseph Crown, a middle-aged white male.

¶4 Plaintiffs state they heard gunfire on their property on the day the News Leader published the list of offenders and then throughout that day and into the morning hours of June 15, 2009, they heard cars drive by and people shout things at them. According to Plaintiffs, they live on a rural dirt road and "[t]he amount of traffic that [they] experienced in front of their house for the thirty-six hour period following the publication of the 'Sex Offender Issue,' was large compared to usual traffic, and the Plaintiffs interpreted it as threats intended toward a convicted sex offender and they feared for their safety."

¶5 Plaintiffs allege Ryan brought the mistake to the attention of the managing editor of the Guthrie News Leader, Belinda Ramsey, on June 15, 2009, the day after the publication. Plaintiffs state, "Later that same day a person named Nixie Goff, purporting to be an employee of the newspaper, called Mrs. Ryan to let her know that it was in fact the newspaper's mistake and not the mistake of the reporting law enforcement agency." Although Ryan demanded the newspaper print a conspicuous correction in the following Sunday edition of the newspaper, the newspaper instead "issued a non-conspicuous correction in the Obituaries Section of the following Wednesday edition, and refused to publish a correction in the following Sunday edition." Plaintiffs further claim the newspaper left the incorrect address on its website until October 31, 2009.

¶6 Plaintiffs assert negligence on the part of Defendants in failing to use ordinary care

when they confirmed, updated, and disseminated information regarding registered sex offenders in their newspaper and on their website. They contend Defendants' negligence led to gunshots being fired near their property and to other harassing and intimidating behavior being directed at them. They also assert a claim for libel alleging Defendants failed to use ordinary care when they confirmed, updated, and disseminated registered sex offender information to the public through the newspaper and on the News Leader's website, which led to gunshots being fired near Plaintiffs' home and to harassment and intimidation. Plaintiffs also seek punitive damages, alleging that, although Defendants "had been given accurate information from the reporting law enforcement agency," Defendants "failed to engage in the minimal editing effort to verify the accuracy of the addresses of convicted sex offenders." Plaintiffs contend that Defendants "intentionally, willfully, recklessly, and/or exhibiting gross negligence caused the false publication to be disseminated in their newspaper and on their website."

¶ 7 Defendants sought summary judgment on Plaintiffs' claims. Below are the material facts Defendants list as undisputed in their motion followed by Plaintiffs' responses:

1. The *Guthrie News Leader* (News Leader) published a story on June 14, 2009, titled, "Registered sex offenders on the rise locally" and a list of 97 registered sex offenders who live in Logan County, Oklahoma, with their photographs and claimed addresses. The list was provided by the Logan County Sheriff's office and the City of Guthrie Police Department. (Disputed. "Defendant published the claimed addresses of 96 of the registered sex offenders living in Logan County. It published one of the sex offenders' addresses as that of the Plaintiffs.")

2. Ryan telephoned the News Leader on June 15, 2009, spoke with the publisher and editor Belinda Ramsey, and advised her that Ryan's address, 9051 West College Avenue, Guthrie, Oklahoma, had appeared in the newspaper the day before under the photograph of a sex offender. (Disputed. "Mrs. Ryan specifically requested a conspicuous correction.")

3. "Belinda Ramsey advised plaintiff Ryan she would check with the Sheriff to see if there had been a mistake and if there had been, the [News Leader] would get it corrected." (Undisputed.)

4. A staff writer for the newspaper, Nixie Goff, telephoned Ryan on June 15, 2009, and advised her that an error had been made in the use of her address in the News Leader the day before. Goff told Ryan that a correction would be published on June 17, 2009, which was the next edition of the News Leader. (Disputed. Ryan told Goff she wanted the correction to appear in the next Sunday edition of the News Leader.)

5. A correction was published on June 17 on page three of the newspaper. The headline read "Correction" and beneath the headline was the following: " 'In a June 14, 2009 published list of registered sex offenders residing in Logan County, Donald Joseph Crown was mistakenly identified as residing at 9051 West College Avenue. His current actual address is 9051 East College Avenue in Guthrie.' " (Undisputed.)

6. Nelson's name did not appear in the newspaper on either June 14, 2009, or June 17, 2009. (Undisputed.)

7. Ryan's name did not appear in the newspaper on either June 14, 2009, or June 17, 2009. (Undisputed.)

8. "Despite expressing their belief that there are some readers of the [News Leader] who believe Plaintiffs' residence is the residence of a sex offender, neither [Nelson nor Ryan] can identify any individual who believed that either of them was a registered sex offender as a result of having read the [News Leader]." (Disputed. "Plaintiffs identify Belinda Ramsey as an individual who believed that either Mr. Nelson or Mrs. Ryan was a registered sex offender as a result of reading it in the [News Leader], and was

not convinced otherwise until she checked with the Sheriff's Department.")

9. Plaintiffs did not allege any special damages or offer any evidence of special damages. (Disputed. "Plaintiffs allege special damages in that the subject publication caused members of the community to target them with gunfire, vandalism, and harassment, and that in response to this they were compelled to upgrade their video surveillance equipment.")

¶ 8 Defendants argue that the article in question "is constitutionally-protected speech on a matter of public concern, and is substantially true and privileged" and Plaintiffs therefore cannot recover under a theory of libel or negligence. They also assert Plaintiffs, as a matter of law, cannot maintain a claim for negligence based on this publication and "cannot maintain a separate cause of action for Punitive Damages."

¶ 9 In response, Plaintiffs set out their own statement of undisputed material facts. Plaintiffs state that in the June 14, 2009, edition of the News Leader, Defendants listed Plaintiffs' address as that of Donald Crown, a registered sex offender. Defendants do not dispute this fact but dispute the other 16 facts recited below that Plaintiffs list as undisputed.

¶ 10 Plaintiffs claim that Defendants admit that the incorrect information was a result of the News Leader's error and not that of the reporting law enforcement agencies. According to Plaintiffs, although Ryan spoke to Ramsey on June 15, 2009, informed her of the error, and asked Ramsey to provide a conspicuous correction, Defendants left the incorrect sex offender edition of the newspaper on its website until October 31, 2009. Plaintiffs claim that someone fired an automatic rifle at or near their residence on the morning of June 14, 2009, and that between the hours of 7:00 p.m., and midnight that day, several vehicles drove past Plaintiffs' residence. Plaintiffs have video evidence of an occupant of a pick-up truck driving past the residence that day yelling, "Pervert." They provided Defendants with video evidence of a white pick-up truck driving by the residence on July 22, 2009, "blaring its horn" and video footage showing a black truck driving by on April 20, 2010, with an occupant yelling, "Freaks." Additional video footage showed someone firing gunshots at or near the residence on August 6, 2010, and August 27, 2010, and a white pick-up blaring its horn on September 17, 2010. Further video footage was provided showing someone breaking out Plaintiffs' lights at the entrance of their property on February 10, 2011, the driver of a red pick-up driving by on July 22, 2011, and extending his middle finger, a black pickup driving by and blaring its horn on August 9, 2011, the driver of a white pick-up pointing a pistol at the residence on July 21, 2011, and the driver of a silver SUV breaking out the lights at the entrance to Plaintiffs' property on September 15, 2011. Plaintiffs allege they purchased new video surveillance equipment on January 7, 2011.

¶ 11 The trial court granted summary judgment in favor of Defendants by holding that the alleged trespasses, vandalism, and harassment were not caused by errors or omissions of Defendants and that Plaintiffs' damages were the result of intervening causes. It further found that Plaintiffs were not mentioned in the newspaper article and that there was only a mistake of address. The court held "[t]hat as a matter of law the Defendant newspaper getting the address wrong and then issuing a correction in the next publication is not libel *per se.*" The court stated, "That we need matters like this published in the paper." The court further held that "the standard for the Plaintiffs to properly state a claim for punitive damages against the Defendant newspaper is actual malice, and that Plaintiffs did not meet this burden."

¶ 12 Plaintiffs appeal.

## STANDARD OF REVIEW

¶ 13 Summary judgment is properly granted "when the pleadings, affidavits, depositions, admissions or other evidentiary materials establish that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Davis v. Leitner,* 1989 OK 146, ¶ 9,

782 P.2d 924. When reviewing a grant of summary judgment, we must view all inferences and conclusions to be drawn from the evidentiary materials in a light most favorable to the party opposing the motion. *Id.*

¶ 14 An appeal from an order granting summary judgment is subject to *de novo* review. *Shull v. Reid,* 2011 OK 72, ¶ 3, 258 P.3d 521. "In its re-examination of the trial tribunal's legal rulings an appellate court exercises plenary, independent and nondeferential authority." *Bronson Trailers & Trucks v. Newman,* 2006 OK 46, ¶ 5, 139 P.3d 885.

## ANALYSIS

¶ 15 Plaintiffs list the following issues to be addressed on appeal: (1) whether the record supported summary judgment, (2) whether summary judgment was premature, (3) whether the trial court erred in finding that Defendants' actions were not libel *per se,* (4) whether the trial court's conclusion regarding intervening cause was reversible error because that issue was not raised or briefed by either party, (5) whether the trial court's holding regarding the standard for punitive damages was reversible error, and (6) whether the trial court made a statement that indicated bias in favor of the news media. With the exception of the sixth issue, all of the issues raised are comprised within the fundamental question of whether summary judgment was properly granted in Defendants' favor.

### I. Negligence Claim

■ ¶ 16 Plaintiffs assert claims against Defendants for negligence, libel, and punitive damages. In their negligence claim, they assert Defendants "failed to use ordinary care in confirming, updating, and disseminating registered sex offender information to the public through both their newspaper . . . and their website."

¶ 17 After review of the record and pertinent authority, we conclude as a matter of law that Plaintiffs cannot state a separate claim of negligence against Defendants. We agree with Defendants, as stated in their motion for summary judgment and support-ing brief, that " '[n]egligence' is the standard of fault that a private figure plaintiff must ultimately prove in a libel case that goes to trial, but 'negligence' is not an independent tort theory based on publication of a newspaper article."

¶ 18 In support of their argument, Defendants cite *Jordan v. World Publishing Company,* 1994 OK CIV APP 30, 872 P.2d 946, in which the principal of a public school brought suit against a newspaper for negligence after the newspaper printed a letter to the editor that the plaintiff claimed the newspaper falsely attributed to the principal. The principal, a public figure, sought to recover against the newspaper for negligence in publishing the letter with its false attribution and for negligent infliction of emotional distress; he did not plead actual malice after being given an opportunity to amend his petition. The newspaper argued that the nature of the action was for libel, or false light invasion of privacy, both of which require a finding of malice before liability could attach against a newspaper for damages to a public figure. *Id.* ¶ 8. The trial court agreed and dismissed the action. *Id.* ¶ 4.

¶ 19 On appeal, this Court held that because the substance of the plaintiff's claim was a false publication and he was without dispute a public figure, the plaintiff was constitutionally required in a libel action like this to plead and prove actual malice. *Id.* ¶ 14. The Court further noted that, pursuant to *Colbert v. World Publishing Co.,* 1987 OK 116, 747 P.2d 286, "a plaintiff in false light privacy cases must plead and prove actual malice." *Id.* ¶ 9. The *Jordan* Court found its case very similar to "*Decker v. Princeton Packet,* 116 N.J. 418, 561 A.2d 1122 (1989)" in which the New Jersey Court held that " 'the first amendment requires that plaintiff establish at least the same level of intent to recover for the infliction of emotional harm as is necessary to find defamation.' " *Jordan,* 1994 OK CIV APP 30, ¶ 11, 872 P.2d 946.

■ ¶ 20 We decline to follow *Jordan* in all aspects because Plaintiffs here are clearly private persons and not subject to the same strictures of pleading and proof as a public figure like Jordan. But we concur with the underlying premise in *Jordan* that when the

nature of the action is a libel claim, the importance of protecting newspapers' First Amendment rights requires adherence to the standards for defamation claims. To apply any lesser standard, such as that for a negligence claim, would, to restate *Decker* as quoted in *Jordan,* allow the use of the tort of negligence to circumvent defenses to defamation actions, including shorter statute of limitations provisions, and to overcome " 'judicial barriers to punitive damages' " applicable in defamation cases. *Id.* ¶ 11.

¶ 21 Other cases have concluded that a plaintiff could not recast a defamation claim as a different tort claim. *See e.g., Grogan v. KOKH, LLC,* 2011 OK CIV APP 34, ¶ 33, 256 P.3d 1021 (agreeing with *Jordan* "that one cannot circumvent the First Amendment by the label with which the suit is described") and *Stewart v. KFOR–TV,* 2006 WL 517656 (W.D.Okla.2006)(citing *Jordan* and concluding the plaintiff could not rely on the same set of facts to recast a defamation claim as a negligence claim).

¶ 22 Because Plaintiffs' allegations of wrongdoing under any theory of recovery involve the gathering and dissemination of information in Defendants' newspaper and on their website, Plaintiffs' negligence claim is not viable as a separate claim. The entry of summary judgment on this question is affirmed. However, this does not preclude Plaintiffs' defamation claim arising from the same allegations of fact.

## II. *Libel Claim*

### A. *Defamatory Statement*

■ ¶ 23 In their claim for libel, Plaintiffs assert that Defendants "failed to use ordinary care of those similarly engaged in print and electronic media in confirming, updating, and disseminating registered sex offender information to the public through both their newspaper ... and their website." They allege Defendants "disseminated a false claim that the Plaintiffs' address was that of a registered sex offender."

■ ¶ 24 For a private figure to state a claim for defamation, he or she must show: "(1) A false and defamatory statement, (2) an unprivileged publication to a third par-

ty, (3) fault amounting at least to negligence on the part of the publisher; and (4) either the actionability of the statement irrespective of special damage [per se], or the existence of special damage [per quod]."

*White v. City of Del City,* 2012 OK CIV APP 5, ¶ 21, 270 P.3d 205 (quoting *Tanique, Inc. v. State ex rel. Okla. Bureau of Narcotics and Dangerous Drugs,* 2004 OK CIV APP 73, ¶ 29, 99 P.3d 1209). It is undisputed that the statement in question was false and that it was published to third parties. Whether it was defamatory to Plaintiffs, whether it was privileged, and what standard of conduct applies to Defendants in this situation remain questions requiring discussion.

■ ¶ 25 "A communication is defamatory if it tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Herbert v. Oklahoma Christian Coal.,* 1999 OK 90, n. 4, 992 P.2d 322. Plaintiffs submitted evidence that they suffered harassment, abuse, and property damage from the public after the publication of their address as that of a sex offender. They allege that the harassment and damage were the result of the perpetrators believing that a sex offender lived in their home. Whether the harassment and vandalism resulted from the publication of their address as that of a sex offender is a question of fact.

■ ¶ 26 "In order for a false statement to be defamatory, it must concern the plaintiff." *Gonzalez v. Sessom,* 2006 OK CIV APP 61, ¶ 12, 137 P.3d 1245. "A defamatory communication concerns the plaintiff if the recipient either correctly, or mistakenly but reasonably, understands that it was intended to refer to the plaintiff." *Id.* (citing Restatement (Second) of Torts § 564 (1977)). Section 564 of the Restatement (Second) of Torts provides, "A defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer." Comment b. to § 564 provides, in part, the following:

*Person mistakenly but reasonably believed to be intended.* If the communication is reasonably understood by the person to whom it is made as intended to refer to the plaintiff, it is not decisive that the defamer did not intend to refer to him. (But see Comment *f*). It is not enough however, that the defamatory matter is actually understood as intended to refer to the plaintiff; the interpretation must be reasonable in the light of all the circumstances. *It is not necessary that the plaintiff be designated by name; it is enough that there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended.*

(Emphasis added.)

¶ 27 Comment f. provides:

*Nature of defamer's conduct.* As indicated in § 580B the defamer is subject to liability if he knew that the communication would be understood by the recipient to refer to the plaintiff or was negligent in failing to recognize that this might happen. If the recipient reasonably understood the communication to be made concerning the plaintiff, it may be inferred that the defamer was negligent in failing to realize that the communication would be so understood.

The common law position was that if the recipient reasonably understood the communication to be made concerning the plaintiff, the defamer was subject to liability even though he was not at fault either because he intended the reference to the plaintiff or because he was negligent in failing to realize that his communication would be so understood by the recipient. This position is now held to be in violation of the First Amendment to the Constitution. The Supreme Court holds that there must be intent, recklessness or negligence on the part of the defamer. (See § 580B). *It is therefore necessary for the plaintiff to prove that a reasonable understanding on the part of the recipient that the communication referred to the plaintiff was one that the defamer was negligent in failing to anticipate.* This is particularly important when the recipient knew of extrinsic facts that make the communication defamatory of the plaintiff but these facts were not known to the defamer.[1]

(Emphasis added).

¶ 28 Here, Defendants printed Plaintiffs' address as the address of a sex offender, and they contend that publication of Plaintiffs' address was a typographical error.[2] No one maintains that a sex offender actually lives at the address listed by the News Leader. However, a reader of the News Leader could have understood the sex offender listing to refer to Roy Nelson, because he was a male living at the address listed in the News Leader as housing a sex offender. And, Plaintiffs allege that the picture of the sex offender, Donald Crown, published in the newspaper "was distorted so that it could be mistaken for Mr. Nelson." Similarly, a reader could have understood that Susan Ryan, as a resident at the address listed, was sharing the residence with a sex offender.

¶ 29 We conclude that Plaintiffs have shown that the communication in the newspaper that a sex offender lived at Plaintiffs' address could reasonably be understood by a recipient to refer to Plaintiffs, either as the sex offender himself in the case of Nelson or as someone housing or residing with a sex offender in the case of Ryan, and further

---

1. Restatement (Second) of Torts § 580(B) (1977) provides:

   One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity, is subject to liability, if, but only if, he
      (a) knows that the statement is false and that it defames the other,
      (b) acts in reckless disregard of these matters, or
      (c) acts negligently in failing to ascertain them.

2. The affidavits of both Belinda Ramsey and Nixie Goff submitted in support of Defendants' motion for summary judgment state that Goff typed the 97 names and addresses into the News Leader's computer system and printed out the list which was then proofread by Goff, Ramsey, and one other staff member. Both Goff and Ramsey then compared the printout to the original list before the names and addresses were published on June 14, 2009. R., tab 6.

that Defendants could reasonably be regarded as negligent in failing to recognize that this might happen when they published the addresses of sex offenders in the county. *See* Restatement (Second) of Torts § 564, cmt. b. (1977).

¶ 30 The News Leader's reference to Plaintiffs' home could also reasonably be regarded as a defamatory statement "concerning" Plaintiffs. For example, in *Michaels v. Gannett Co.*, 10 A.D.2d 417, 199 N.Y.S.2d 778 (N.Y.App.Div.1960), a newspaper article identified the plaintiff as living at his correct address but incorrectly stated that he owed $133,239.88 in unpaid taxes. *Id.* at 779–80. The court stated, "A jury would have been justified in finding that the article tended to expose the person to whom it referred to 'hatred, contempt or aversion,' or that it tended 'to induce an evil or unsavory opinion of him in the minds of a substantial number of the community.' " *Id.* at 780. The court found that it was immaterial that the newspaper did not intend to refer to the plaintiff or that the newspaper's publication of the plaintiff's address was a mistake. *Id.* at 780.

¶ 31 In *Fitzpatrick v. Age–Herald Publishing Company*, 184 Ala. 510, 63 So. 980, 980 (1913), the Supreme Court of Alabama addressed whether the following statement in a newspaper constituted libel: " 'The shooting occurred on Avenue E, between Eleventh and Twelfth streets, in a house which bears a bad reputation with the police.' " The plaintiff, who lived in the house identified by the article, alleged that he was greatly humiliated by the article and that his reputation was greatly impaired. *Id.* One question before the Court was whether the statement constituted libel of the plaintiff or of the house where he resided. *Id.* The Court answered this question with the following:

The house acquires whatever reputation it has from the occupants thereof; it can make or earn none for itself; it can and does reflect only the reputation of its occupants, or those who frequent it. We know of no way by which a house can, of its own act, acquire a reputation. This being true, when we speak of a certain house as being disorderly, we must necessarily be understood as referring to the conduct of those who live in, or who frequent, the same by and with the permission of the occupants. *When, therefore, it is said of a house, "It has a bad reputation with the police," we refer to the head of that house, and, in fact, we reflect upon each member of the same.* The language of the publication is, "The shooting occurred on Avenue E, between Eleventh and Twelfth streets, in a house which bears a bad reputation with the police." This charges that, at the present time, the house bears a bad reputation with the police; and, under the plaintiff's averment, it was at that moment of time, and had been for a long while prior thereto, the place where he and his family resided. *This reflected upon the plaintiff, for he and his family must be held to be the ones who gave to the house, and continued to give to it, that reputation, for the house is void of life and could not make for itself a bad reputation.*

*Id.* at 981 (emphasis added). The Court concluded "that the publication in question was 'of and concerning' the plaintiff, who resided in the house in question." *Id.* The Court also stated:

The published words did not, it is true, charge the plaintiff, or any member of his family, with an indictable offense; but, giving to the publication the meaning that the words employed generally and fairly import, it tended to subject the plaintiff, the head of the house, to public hatred, contempt, or ridicule, and tended to reflect shame upon him, and to put him without the pale of social intercourse. This being true, the words were libelous per se.

*Id.* at 982.

¶ 32 Although these cases from other jurisdictions are not controlling, they offer insight into how reference to an address can reflect negatively on the owner or occupant of that address. We are persuaded that Plaintiffs have raised sufficient questions of fact on which "reasonable persons might reach different inferences or conclusions," *Buck's Sporting Goods, Inc. of Tulsa v. First National Bank & Trust Co. of Tulsa*, 1994 OK 14, ¶ 11, 868 P.2d 693, as to whether the statement was of and concerning Plaintiffs and therefore defamatory.

B. *Privilege*

### 1. Fair Comment

■ ¶ 33 Defendants next assert that the publication was protected by both statutory and common law privilege. The trial court found "[t]hat we need matters like this published in the paper," a statement appearing to invoke the concept of privilege afforded to published statements involving matters of legitimate public interest.

■ ¶ 34 "Fair comment is a common law defense to a defamation action. The principle affords legal immunity for comment by any and all members of the public *and extends to virtually all matters of legitimate public interest.* Its purpose is to promote the free and open exchange of ideas." *Magnusson v. New York Times Co.,* 2004 OK 53, ¶ 9, 98 P.3d 1070. In *Magnusson,* the Oklahoma Supreme Court said:

> The common law fair comment privilege extends to fair expressions on matters of public interest. It differs from both: 1) the common law fair report privilege—which affords a qualified or conditional privilege to the media when they republish defamatory material in an account of a public or official proceeding, *i.e.,* judicial proceedings, legislative sessions, judicial hearings, or official news conferences; and 2) its statutory counterpart, 12 O.S.2001 § 1443.1—which embodies a similar statutory privilege as a complete defense to libel. Although all three concepts overlap, the scope of the common law fair comment privilege, encompassing expressions of opinion on all matters of public opinion, is broader than either the common law fair report doctrine or the terms of the statute—both of which have their roots in political speech concepts and encompass public interest reports of official actions or proceedings.

*Id.* ¶ 10. The Court applied the common law defense of fair comment to a statement representing "the actual opinion of the speaker" on a matter of public concern. *Id.* ¶ 11. If a statement about an individual can be proven true or false, it is not an opinion. *Id.* ¶ 13. The sex offender information published by the News Leader here was not a statement or expression of opinion, and cannot be rea-sonably construed as such, and the fair comment privilege therefore does not apply.

### 2. Fair Report

■ ¶ 35 As to the common law fair report privilege, the Oklahoma Supreme Court in *Wright v. Grove Sun Newspaper Co., Inc.,* 1994 OK 37, ¶ 8, 873 P.2d 983, explained as follows:

> The elements of the common-law *fair report privilege,* drawn from the seventeenth and eighteenth century English developments, are defined in the RESTATEMENT (SECOND) OF TORTS § 611. The text of that section is:

> > The publication of defamatory matter concerning another in a report of an *official* action or proceeding or of a meeting *open to the public* that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported. [Emphasis added.]

> > The privilege is not conditioned upon the truth or falsity of the reported material, the character of the defamed person, nor on the newsworthiness of the event; rather, its applicability is determined by the *nature of the occasion* at which the republished material was secured for news coverage. The critical occasion here is the district attorney's news conference—a legitimate activity of his office, open to the public and held for the purpose of addressing a matter of general concern to the community. As the privilege is *qualified,* its abuse and loss would occur if the newspaper does not *accurately* and *fairly* republish that which was gathered from a public meeting, or if the republished material is not of general public interest.

■ ¶ 36 Although the information in the present article apparently came from law enforcement sources, it is not clear whether this publication constitutes a report of an official action, proceeding or meeting. As stated above in *Wright,* the applicability of the fair report privilege depends on "the *nature of the occasion* at which the republished material was secured for news cover-

age." *Id.* ¶ 8. This cannot be ascertained from the record before us and remains to be determined.

¶ 37 If we assume the published information is of public concern and could be said to have resulted from judicial or other official proceedings and therefore constitutes "a report" subject to the fair report privilege, the question of whether the report was fair, accurate and complete remains a fact question to be determined. *Stewart v. NYT Broadcast Holdings, LLC,* 2010 OK CIV APP 89, ¶ 19, 240 P.3d 722 ("Whether the reports were substantially accurate presented a question for the jury to determine."),

### 3. Title 12, Section 1443.1

¶ 38 Defendants also argue that the publication is protected by either the statutory "fair report" or the "fair comment" privilege provided by 12 O.S. § 1443.1.[3] The News Leader states that the sex offender information that it published was given to it by the Logan County Sheriff's office and the City of Guthrie Police Department. As discussed above, the published material complained of is not an expression of opinion, and the statutory fair comment privilege, like its common law counterpart, does not apply. Whether the statutory fair report privilege in 1443.1, like its common law counterpart discussed above, applies in this § instance cannot be resolved as a matter of law and remains to be determined.

### C. *Defendants' Conduct*

¶ 39 As to the element of Defendants' conduct, Plaintiffs, to establish their claim for defamation as private persons, must also prove fault on the part of the publisher at least amounting to negligence. In *Malson v. Palmer Broadcasting Group,* 1997 OK 42, ¶ 9, 936 P.2d 940, the Oklahoma Supreme Court reiterated "that the news media must exercise ordinary care in reporting news stories concerning private individuals." Ordinary care is "'that degree of care which ordinarily prudent persons engaged in the same kind of business usually exercise under similar circumstances.'" *Id.* (quoting *Martin v. Griffin Television, Inc.,* 1976 OK 13, ¶ 23, 549 P.2d 85). A "'failure to exercise such ordinary care would be negligence.'" *Id.*

¶ 40 It is not disputed that the News Leader made an error in the publication of the sex offender information as it pertains to Plaintiffs. But whether the News Leader exercised ordinary care in its publication of this information cannot be settled as a matter of law. "[T]he best *evidence* of ordinary [ ] care is the degree of care which ordinarily prudent persons, engaged in the same kind of business, customarily have exercised and commonly do exercise under similar circumstances." *Malson,* 1997 OK 42, ¶ 10, 936 P.2d 940. Plaintiffs are entitled to present evidence on this question to the trier of fact to show that the News Leader failed to exercise ordinary care in these circumstances. The exercise of ordinary care may be established by evidence of the custom and practice in the print media or newspaper business. *Id.* "The degree of care that an ordinary person should exercise in a given situation normally presents an issue for the jury." *Id.* ¶ 12. Because facts remain in dispute about whether ordinary care was exercised under the circumstances, we conclude the trial court's grant of summary judgment in favor of Defendants on Plaintiffs' defamation claim cannot be sustained.

### D. *Libel Per Se*

¶ 41 There are several remaining issues raised by Plaintiffs on appeal regard-

---

**3.** Title 12 O.S.2011 § 1443.1 provides:

A. A privileged publication or communication is one made:
First. In any legislative or judicial proceeding or any other proceeding authorized by law;
Second. In the proper discharge of an official duty;
Third. By a fair and true report of any legislative or judicial or other proceeding authorized by law, or anything said in the course thereof, and any and all expressions of opinion in regard thereto, and criticisms thereon, and any and all criticisms upon the official acts of any and all public officers, except where the matter stated of and concerning the official act done, or of the officer, falsely imputes crime to the officer so criticized.
B. No publication which under this section would be privileged shall be punishable as libel.

ing their libel claim. Libel is defined by statute as:

> a false or malicious unprivileged publication by writing, printing, picture, or effigy or other fixed representation to the eye, which exposes any person to public hatred, contempt, ridicule or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation, or any malicious publication as aforesaid, designed to blacken or vilify the memory of one who is dead, and tending to scandalize his surviving relatives or friends.

12 O.S.2011 § 1441. "A publication is libelous *per se* (when the defamatory impact is apparent on its face) if it 'exposes any person to public hatred, contempt, ridicule or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation....'" *Gaylord Entm't Co. v. Thompson*, 1998 OK 30, ¶ 35, 958 P.2d 128 (quoting 12 O.S.1991 § 1441). "To determine whether a publication is libelous *per se*, the writing must be measured by its natural and probable effect upon the mind of the average lay reader." *Id.* ¶ 35.

▉▉▉ ¶ 42 Unlike libel *per se* where the publication is susceptible only to a defamatory meaning, a "publication is deemed libelous *per quod* if the words are reasonably susceptible of both a defamatory and an innocent meaning," meaning that extrinsic facts are required to show a defamatory meaning. *Id.* ¶ 35. "Whether a writing is libelous *per se* presents an issue of law for the trial court's resolution." *Id.* "A fact determination, if necessary to decide whether a publication is libelous *per quod*, is for the jury." *Id.*

¶ 43 The trial court here held that "as a matter of law the Defendant newspaper getting the address wrong and then issuing a correction in the next publication is not libel

*per se.*" Based on the nature of the publication here and the standard to be applied in ascertaining whether it is libelous *per se*, this conclusion cannot as a matter of law be upheld. One could reasonably conclude that the impact of the publication of Plaintiffs' address as that of a convicted sex offender is apparent on its face and susceptible of but one opprobrious meaning, can be "measured by its natural and probable effect upon the mind of the average lay reader," *Id.* ¶ 35, and could expose Plaintiffs to public hatred or contempt. Whether it is susceptible of a different, innocent meaning is an issue for the trial court. If otherwise found actionable after consideration of the elements discussed above,[4] whether the publication of Plaintiffs' address constitutes libel *per se* or libel *per quod* must be addressed *on remand.*[5]

### III. Punitive Damages

▉▉▉ ¶ 44 On the question of punitive damages, Plaintiffs stated in their response and objection to the motion for summary judgment, "if there is no finding of liability against the Defendant, then punitive damages will not stand as a separate cause of action." Plaintiffs are correct that punitive damages do not constitute a separate cause of action, but not for the reason argued—this conclusion is not dependent on a finding of "no liability." Punitive damages, like compensatory damages, do not stand alone as a separate cause of action; they constitute an element of damage subject to proof in connection with Plaintiffs' cause of action for libel.

¶ 45 Although punitive damages do not constitute a separate cause of action, this does not preclude Plaintiffs from seeking their recovery subject to appropriate supporting evidence and proper instructions.

---

4. As discussed previously in this Libel Claim section, for a private figure to state a claim for defamation, he or she must show:

"(1) A false and defamatory statement, (2) an unprivileged publication to a third party, (3) fault amounting at least to negligence on the part of the publisher; and (4) either the actionability of the statement irrespective of special damage [per se], or the existence of special damage [per quod]."

*White v. City of Del City*, 2012 OK CIV APP 5, ¶ 21, 270 P.3d 205 (quoting *Tanique, Inc. v. State*

*ex rel. Okla. Bureau of Narcotics and Dangerous Drugs*, 2004 OK CIV APP 73, ¶ 29, 99 P.3d 1209).

5. At the hearing on Defendants' motion for summary judgment, counsel for the parties discussed the question of other, non-opprobrious meanings. However, after concluding that the statement was not libelous *per se*, the trial court's order failed to address whether the statement could be found to be libelous *per quod*.

The issue of punitive damages must be addressed if Plaintiffs present sufficient evidence to meet the standard for their recovery, and the entry of summary judgment on this issue was premature.

¶ 46 It is conceded that Plaintiffs are not public figures but private persons. Pursuant to *Martin v. Griffin Television, Inc.*, 1976 OK 13, ¶ 28, 549 P.2d 85, the standard of actual malice is to be applied for the recovery of punitive damages where the defamed party is a private person. The actual malice standard requires the defendant to have acted with knowledge that the publication was false, or with reckless disregard for whether it was false.[6] *Id.*

¶ 47 Because we reverse the summary judgment entered on Plaintiffs' libel claim, the issue of punitive damages with its requisite burden of proof in regard to a libel claim by private persons must be revisited on remand.

*IV. Code of Judicial Conduct*

¶ 48 Finally, Plaintiffs cite two provisions of the Code of Judicial Conduct which they contend the trial court violated. Rule 2.2 of the Code of Judicial Conduct, 5 O.S. 2011, ch. 1, app. 4, provides, "A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially." Rule 2.4 of the Code of Judicial Conduct, 5 O.S.2011, ch. 1, app. 4, provides:

(A) A judge shall not be swayed by public clamor or fear of criticism.

(B) A judge shall not permit family, social, political, financial, or other interests or relationships to influence the judge's judicial conduct or judgment.

(C) A judge shall not convey or permit others to convey the impression that any person or organization is in a position to influence the judge.

Plaintiffs ask this Court to resolve the issue of "[w]hether the District Judge's statement that both he and his son were Journalism Majors prior to the initiation of the proceedings . . . was an indication or manifestation of bias in favor of the news media" in violation of the Code of Judicial Conduct. We decline to find that this statement alone regarding a college major indicates bias in favor of the news media.

## CONCLUSION

¶ 49 Although we conclude that Plaintiffs cannot assert a separate cause of action for negligence arising from this publication, we further conclude that material issues of fact remain that preclude the entry of judgment as a matter law in favor of Defendants on Plaintiffs' libel claim. Accordingly, we affirm in part and reverse in part the order of the trial court granting summary judgment and remand the case for further proceedings on Plaintiffs' libel claim consistent with this Opinion.

¶ 50 **AFFIRMED IN PART, REVERSED IN PART AND REMANDED FOR FURTHER PROCEEDINGS.**

BARNES, C.J., and THORNBRUGH J. (sitting by designation), concur.

---

6. Plaintiffs argue that the News Leader's lack of any "standard policies and procedures for ensuring the accuracy of any of the information it disseminates" is reckless, as well as its insufficient retraction or "level of correction" of the error published in the paper and its failure for four months to correct the false publication on its website.