2006 OK CIV APP 61

**Janie J. GONZALEZ, Plaintiff/Appellant,**

**v.**

**Wade SESSOM, D.D.S. and Carrie Sessom, D.D.S., Defendants/Appellees.**

**No. 101,749.**

Court of Civil Appeals of Oklahoma, Division No. 1.

Jan. 20, 2006.

Rehearing Denied March 3, 2006.

Certiorari Denied May 15, 2006.

Bill V. Wilkinson, Wilkinson Law Firm, Tulsa, OK, for Plaintiff/Appellant.

Robert Taylor, Neil D. Van Dalsem, Ashley M. Bibb, King, Taylor & Ryan, P.C., Tulsa, OK, for Defendants/Appellees.

Opinion by CAROL M. HANSEN, Judge.

¶ 1 Plaintiff/Appellant, Janie J. Gonzalez, seeks review of the trial court's order sustaining a demurrer and granting judgment in favor of Defendant/Appellees, Wade Sessom and Carrie Sessom, after the close of plaintiff's evidence at jury trial on Gonzalez' claims for defamation, tortious interference with contract, and intentional or negligent infliction of emotional distress. We reverse and remand for jury trial as to the defamation claim because Gonzalez submitted evidence establishing a *prima facie* case for defamation. We otherwise affirm the trial court's order.

¶ 2 Gonzalez was a dental hygienist for Brett Dieterlen, a dentist who practiced with his father, Bruce Dieterlen, in Tulsa, Oklahoma. The Sessoms are dentists in Tulsa, practicing in partnership. Gonzalez sued the Sessoms, alleging she was constructively discharged from her employment with Brett Dieterlen as a result of a defamatory statement made by an employee of the Sessoms acting on their behalf. The Sessoms answered and denied liability.

¶ 3 The case went to jury trial on January 3, 4, and 5, 2005. Gonzalez put on evidence she was one of six hygienists at the Dieterlen office. She cleaned the teeth of Bruce Dieterlen's patient, Cheryl Weatherly, in November 2002 and June 2003, although she was not Weatherly's regular hygienist. During the second visit, Gonzalez and Weatherly had a conversation regarding grass sod, and the following day, Weatherly left a message for Gonzalez seeking the name of a sod company Gonzalez had recommended.

¶ 4 Weatherly testified she made an appointment at the Sessom office to seek a second opinion on dental work Bruce Dieterlen had performed. According to the Sessoms' records, Weatherly saw Carrie Sessom on June 12 and June 18, 2003. Weatherly said she had also sought a second opinion from Dr. Funderburk, another Tulsa dentist. She said she met with Carrie Sessom and told her she had questions about the adequacy of Bruce Dieterlen's dental services. She testified she told Sessom what she had learned from an employee of Funderburk:

I said that there was a—I don't know if I said a dental hygienist because I wasn't sure who this person was at Dr. Funderburk's office, I think she was maybe the

secretary, dental assistant, and dental hygienist, and I said she had told me that there were—that they had sent X-rays over to Dieterlen's office and when I went to pick them up they weren't there. She told me I had an abscess under some teeth, and Dr. Dieterlen told me I did not.

Weatherly denied telling Sessom an employee of the Dieterlen office had criticized Bruce Dieterlen. She said she did not authorize the Sessoms to notify Bruce Dieterlen she had sought a second opinion, stating, "I would have died if I had known they were going to do that." At the time of trial, Weatherly had a lawsuit pending against Bruce Dieterlen.

¶ 5 Carrie Sessom and her dental assistant, Kristi Foster, controverted Weatherly's testimony. Sessom testified,

[Weatherly] told me that she had an inside source from their [Dieterlens'] office that felt like X-rays were missing. She said that this person said I wish I had a key to be able to look through the trashes so that I could see if they tried to throw anything away. And she said that they also have said that Dr. Dieterlen's office had had a meeting about her, the patient.

Foster testified Weatherly said she had an "inside source" at Dieterlen's office who was concerned about a missing X-ray.

¶ 6 Sessom said she later had a conversation with Foster about Weatherly, which another employee, Amy Burk, overheard. Sessom testified as follows:

A [Burk] mentioned that she knew someone in the Dieterlen office and she said, do you want me to call. And I just said, I would want to know.

Q And by making that comment did you give her authority to make a call?

A Yes, I did.

Q Okay. And you know that a call was made.

A Yes, I do know a call was made.

Q Did you ever tell Amy Burk that the inside source was a hygienist?

A I didn't have any notion of who the inside source was.

Q Did the patient ever identify the inside source?

A No.

¶ 7 Amy Burk testified she called Pegi Kitchen in the Dieterlen office:

I told her that there was—we had a patient in the office for a second opinion and that there was—she was saying that there was an employee in her office saying there were some X-rays or files missing and she should take action. And Pegi said, okay, thank you for letting me know, and that was the end of our conversation.

Burk said it was "very possible" she told Kitchens the name of the patient was Cheryl Weatherly. She said she had never heard the name Janie Gonzalez, but said "[i]t is possible" she told Kitchens the person stirring up trouble was a dental hygienist.

¶ 8 Gonzalez testified she had been a dental hygienist for twenty-four years and had worked for Brett Dieterlen for nine years. She said she had a good working relationship with him until June 18, 2003, when he accused her of encouraging Weatherly to make a claim against his father. Gonzalez testified she was "stunned" and denied the accusation. She said she told him to talk to Weatherly, Burk, and Sessom to clear up the misunderstanding, but he did not do so

¶ 9 Gonzalez testified her working relationship with the Dieterlens and their staff after June 18, 2003, was "very different." She said the Dieterlens shunned her, would not talk to her or make eye contact with her, and turned their backs to her. She said the other employees were "absolutely hateful." On June 30, 2003, Gonzalez wrote Brett Dieterlen a letter saying she felt she had no choice but to resign. Dieterlen responded with a letter accepting her resignation.

¶ 10 After the close of Gonzalez' evidence, the Sessoms demurred to the evidence and moved for judgment in favor of Wade Sessom on the grounds there was no evidence he personally communicated with either the patient or the Dieterlens' office or that he authorized any such communication. The trial court granted judgment in favor of Wade Sessom. The Sessoms then moved for judgment in favor of Carrie Sessom as to the defamation claim on the grounds the evi-

dence failed to show there was a false statement and that the statement was of or concerning Gonzalez. They moved for judgment on the intentional or negligent infliction of emotional distress claim on the grounds there was no evidence of extreme and outrageous conduct and there is no cause of action in Oklahoma for negligent infliction of emotional distress. They moved for judgment as to the interference with employment relationship claim on the grounds there was no evidence Carrie Sessom intended to interfere with Gonzalez' employment relationship. The trial court granted a directed verdict as to all three causes of action and entered judgment in favor of the Sessoms. Gonzalez appeals.

¶ 11 In reviewing an order sustaining a demurrer and directing a verdict, we will consider as true all evidence and all reasonable inferences favorable to the party opposing the demurrer or motion, and disregard any conflicting evidence favorable to the demurrant or movant. The demurrer or motion should be overruled unless there is an absence of proof showing a right to recover. *Messler v. Simmons Gun Specialties, Inc.*, 1984 OK 35, 687 P.2d 121, 130.

I

¶ 12 Gonzalez' first contention is the trial court erred in dismissing her defamation claim based upon the lack of evidence that the defendants identified Gonzalez as the inside source at the Dieterlen office. We agree. In order for a false statement to be defamatory, it must concern the plaintiff. *Sturgeon v. Retherford Publications, Inc.*, 1999 OK CIV APP 78, 987 P.2d 1218, 1223 (citing Restatement (Second) of Torts § 558 (1977)). A defamatory communication concerns the plaintiff if the recipient either correctly, or mistakenly but reasonably, understands that it was intended to refer to the plaintiff. Restatement (Second) of Torts § 564 (1977). Comment b to this section of the Restatement states,

If the communication is reasonably understood by the person to whom it is made as intended to refer to the plaintiff, it is not decisive that the defamer did not intend to refer to him. (But see Comment f). It is not enough, however, that the defamatory matter is actually understood as intended to refer to the plaintiff; the interpretation must be reasonable in the light of all the circumstances. It is not necessary that the plaintiff be designated by name; it is enough that there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended. Extrinsic facts may make it clear that a statement refers to a particular individual although the language used appears to defame nobody.

Comment f addresses the defamer's state of mind:

[T]he defamer is subject to liability if he knew that the communication would be understood by the recipient to refer to the plaintiff or was negligent in failing to recognize that this might happen.... It is therefore necessary for the plaintiff to prove that a reasonable understanding on the part of the recipient that the communication referred to the plaintiff was one that the defamer was negligent in failing to anticipate. This is particularly important when the recipient knew of extrinsic facts that make the communication defamatory of the plaintiff but these facts were not known to the defamer.

¶ 13 Although we find no Oklahoma cases in which the recipient of the communication mistakenly but reasonably understood a defamatory communication to refer to the plaintiff, such a fact situation is analogous to that in which a group is defamed. In group defamation cases, the defamer is not liable unless the recipient of the communication reasonably understands it to refer to the plaintiff. See *Fawcett Publications, Inc. v. Morris*, 1962 OK 183, 377 P.2d 42, 48 (Whether an article regarding the taking of drugs by a university football team is defamatory "must be measured by its natural and probable effect upon the mind of the average lay reader."). Therefore, we believe the Oklahoma Supreme Court would apply the same rule in mistaken defamation cases.

¶ 14 Gonzalez presented evidence from which the jury could find the Sessoms'

employee, in the course of her employment, made a false statement to the Dieterlens' employee that a dental hygienist in the Dieterlen office told Cheryl Weatherly her x-rays were missing and she should sue Bruce Dieterlen. The jury could find the Dieterlen employee mistakenly but reasonably understood the communication to refer to Gonzalez based on the extrinsic facts that Gonzalez had recently cleaned Weatherly's teeth and Weatherly soon thereafter left a personal phone message for Gonzalez. It could find the Sessom employee should have known or was negligent in failing to anticipate that the Dieterlen employee would have access to extrinsic facts from which she could identify Gonzalez as being the subject of the communication. The jury could find Gonzalez was injured in her employment by being constructively discharged as a result of the defamatory statement. Because Gonzalez put on evidence establishing a *prima facie* case of defamation, the trial court should have submitted the matter to the jury. It erred in sustaining the demurrer and in granting judgment to the Sessoms on the defamation claim.

## II

¶ 15 Gonzalez' next contention is the trial court erred in granting directed verdict as to the negligent infliction of emotional distress claim. The trial court correctly ruled that negligent infliction of emotional distress was an item of damage, not an independent claim. *Kraszewski v. Baptist Medical Center of Oklahoma, Inc.,* 1996 OK 141, 916 P.2d 241, 243. On remand, Gonzalez may recover for emotional distress, as well as impairment of reputation and standing in the community, personal humiliation, and loss of income, as damages for defamation, subject to proof. *Martin v. Griffin Television, Inc.,* 1976 OK 13, 549 P.2d 85, 93.

## III

¶ 16 Gonzalez' next contention is the trial court should have submitted her claim for tortious interference with contract to the jury. The essential elements of a claim for intentional interference with prospective economic advantage are (1) the existence of a valid business relation or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the party whose relationship has been disrupted. The interference is intentional if the interferer acted with the purpose to interfere with the relationship or expectancy. *Boyle Services, Inc. v. Dewberry Design Group, Inc.,* 2001 OK CIV APP 63, 24 P.3d 878, 880. Gonzalez failed to put on evidence the Sessoms' employee acted with the purpose to interfere with Gonzalez' employment relationship. Therefore, the trial court properly directed a verdict in favor of the Sessoms on the tortious interference with contract claim.

## IV

¶ 17 Gonzalez's last contention is the trial court erred in dismissing Wade Sessom as a party on the grounds he did not participate in the defamatory communication. Gonzalez sued the Sessoms under *respondeat superior* for the wrongful conduct of their employee. She put on evidence the Sessoms practiced in partnership and the employee was employed by the partnership when she engaged in the wrongful act. In a general partnership, all partners are liable jointly and severally for all obligations of the partnership. 54 O.S.2001 § 1–306(a). Gonzalez may bring her claim against any or all of the partners. 54 O.S.2001 § 1–307(b).[1] Therefore, the trial court erred in dismissing Wade Sessom as a party.

¶ 18 For the foregoing reasons, the trial court's judgment in favor of Carrie Sessom and Wade Sessom on Gonzalez' claim for defamation is REVERSED and this matter is REMANDED for jury trial. The trial court's order is otherwise AFFIRMED.

¶ 19 AFFIRMED IN PART; REVERSED IN PART AND REMANDED.

JOPLIN, J., and BELL, P.J., concur.

---

1. See also *Segars v. McCormick,* 2002 OK CIV APP 89, 55 P.3d 470.