OSCN Found Document:NELSON v. AMERICAN HOMETOWN PUBLISHING, INC.

 
 
 
 OSCN navigation


 
 Home

 
 Courts

 
 Court Dockets

 
 Legal Research

 
 Calendar

 
 Help
 





 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 

 
 
 
 NELSON v. AMERICAN HOMETOWN PUBLISHING, INC.
2014 OK CIV APP 57
Case Number: 111193
Decided: 02/24/2014
Mandate Issued: 06/11/2014
DIVISION IV
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION IV
Cite as: 2014 OK CIV APP 57, __ P.3d __

ROY D. NELSON and SUSAN E. RYAN, 
Plaintiffs/Appellants,
v.
AMERICAN HOMETOWN PUBLISHING, INC., a foreign 
corporation; and AMERICAN HOMETOWN PUBLISHING, INC., a foreign corporation, 
d/b/a Guthrie News Leader, Defendants/Appellees.

APPEAL FROM THE DISTRICT COURT OF
OKLAHOMA COUNTY, 
OKLAHOMA
HONORABLE BILL GRAVES, TRIAL JUDGE

AFFIRMED IN PART, REVERSED IN PART AND REMANDED FOR 
FURTHER PROCEEDINGS

Thomas A. Ryan, THOMAS A. RYAN, PLLC, Oklahoma City, Oklahoma, for 
Plaintiffs/Appellants
S. Douglas Dodd, Jon E. Brightmire, Amanda L. Thrash, 
DOERNER, SAUNDERS, DANIEL & ANDERSON, L.L.P., Tulsa, Oklahoma, for 
Defendants/Appellees


JANE P. WISEMAN, PRESIDING JUDGE:
¶1 Roy D. Nelson and Susan E. Ryan appeal from a trial court order granting 
summary judgment in favor of American Hometown Publishing, Inc., and American 
Hometown Publishing, Inc., d/b/a Guthrie News Leader. The issue appealed is 
whether the trial court erred in granting Defendants judgment as a matter of 
law. This appeal stands submitted pursuant to Supreme Court Rule 1.36, 12 
O.S.2011, ch. 15, app.1, without appellate briefing. After de novo review 
of the record and applicable law, we affirm in part and reverse in part the 
trial court decision and remand for further proceedings.
FACTS AND PROCEDURAL BACKGROUND
¶2 On May 17, 2010, Nelson and Ryan (collectively, Plaintiffs) filed a 
lawsuit against Newspaper Holdings, Inc., d/b/a/ Guthrie News Leader, asserting 
claims for negligence, libel, and punitive damages arising from publication of 
an incorrect listing of Plaintiffs' home address as the address of a registered 
sex offender. Plaintiffs filed an amended petition on June 14, 2010, naming as 
defendants Newspaper Holdings, Inc., a foreign corporation, d/b/a Guthrie News 
Leader, American Hometown Publishing, Inc., a foreign corporation, and American 
Hometown Publishing, Inc., a foreign corporation, d/b/a Guthrie News Leader 
(collectively, Defendants).
¶3 Stating that they live at 9051 West College Avenue, Guthrie, Oklahoma, 
Plaintiffs allege:

 
 That on or about June 14, 2009, the Defendants . . . published a list of 
 sex offenders registered in Logan County in the local newspaper, Guthrie 
 News Leader. The list incorrectly listed the Plaintiffs' address as that of 
 a registered sex offender named Donald Joseph Crown, a middle-aged white 
 male.
¶4 Plaintiffs state they heard gunfire on their property on the day the News 
Leader published the list of offenders and then throughout that day and into the 
morning hours of June 15, 2009, they heard cars drive by and people shout things 
at them. According to Plaintiffs, they live on a rural dirt road and "[t]he 
amount of traffic that [they] experienced in front of their house for the 
thirty-six hour period following the publication of the 'Sex Offender Issue,' 
was large compared to usual traffic, and the Plaintiffs interpreted it as 
threats intended toward a convicted sex offender and they feared for their 
safety."
¶5 Plaintiffs allege Ryan brought the mistake to the attention of the 
managing editor of the Guthrie News Leader, Belinda Ramsey, on June 15, 2009, 
the day after the publication. Plaintiffs state, "Later that same day a person 
named Nixie Goff, purporting to be an employee of the newspaper, called Mrs. 
Ryan to let her know that it was in fact the newspaper's mistake and not the 
mistake of the reporting law enforcement agency." Although Ryan demanded the 
newspaper print a conspicuous correction in the following Sunday edition of the 
newspaper, the newspaper instead "issued a non-conspicuous correction in the 
Obituaries Section of the following Wednesday edition, and refused to publish a 
correction in the following Sunday edition." Plaintiffs further claim the 
newspaper left the incorrect address on its website until October 31, 2009.
¶6 Plaintiffs assert negligence on the part of Defendants in failing to use 
ordinary care when they confirmed, updated, and disseminated information 
regarding registered sex offenders in their newspaper and on their website. They 
contend Defendants' negligence led to gunshots being fired near their property 
and to other harassing and intimidating behavior being directed at them. They 
also assert a claim for libel alleging Defendants failed to use ordinary care 
when they confirmed, updated, and disseminated registered sex offender 
information to the public through the newspaper and on the News Leader's 
website, which led to gunshots being fired near Plaintiffs' home and to 
harassment and intimidation. Plaintiffs also seek punitive damages, alleging 
that, although Defendants "had been given accurate information from the 
reporting law enforcement agency," Defendants "failed to engage in the minimal 
editing effort to verify the accuracy of the addresses of convicted sex 
offenders." Plaintiffs contend that Defendants "intentionally, willfully, 
recklessly, and/or exhibiting gross negligence caused the false publication to 
be disseminated in their newspaper and on their website."
¶7 Defendants sought summary judgment on Plaintiffs' claims. Below are the 
material facts Defendants list as undisputed in their motion followed by 
Plaintiffs' responses:

 
 1. The Guthrie News Leader (News Leader) published a story on June 
 14, 2009, titled, "Registered sex offenders on the rise locally" and a list 
 of 97 registered sex offenders who live in Logan County, Oklahoma, with 
 their photographs and claimed addresses. The list was provided by the Logan 
 County Sheriff's office and the City of Guthrie Police Department. 
 (Disputed. "Defendant published the claimed addresses of 96 of the 
 registered sex offenders living in Logan County. It published one of the sex 
 offenders' addresses as that of the Plaintiffs.")
 2. Ryan telephoned the News Leader on June 15, 2009, spoke with the 
 publisher and editor Belinda Ramsey, and advised her that Ryan's address, 
 9051 West College Avenue, Guthrie, Oklahoma, had appeared in the newspaper 
 the day before under the photograph of a sex offender. (Disputed. "Mrs. Ryan 
 specifically requested a conspicuous correction.")
 3. "Belinda Ramsey advised plaintiff Ryan she would check with the 
 Sheriff to see if there had been a mistake and if there had been, the [News 
 Leader] would get it corrected." (Undisputed.)
 4. A staff writer for the newspaper, Nixie Goff, telephoned Ryan on June 
 15, 2009, and advised her that an error had been made in the use of her 
 address in the News Leader the day before. Goff told Ryan that a correction 
 would be published on June 17, 2009, which was the next edition of the News 
 Leader. (Disputed. Ryan told Goff she wanted the correction to appear in the 
 next Sunday edition of the News Leader.)
 5. A correction was published on June 17 on page three of the newspaper. 
 The headline read "Correction" and beneath the headline was the following: 
 "'In a June 14, 2009 published list of registered sex offenders residing in 
 Logan County, Donald Joseph Crown was mistakenly identified as residing at 
 9051 West College Avenue. His current actual address is 9051 East College 
 Avenue in Guthrie.'" (Undisputed.)
 6. Nelson's name did not appear in the newspaper on either June 14, 2009, 
 or June 17, 2009. (Undisputed.)
 7. Ryan's name did not appear in the newspaper on either June 14, 2009, 
 or June 17, 2009. (Undisputed.)
 8. "Despite expressing their belief that there are some readers of the 
 [News Leader] who believe Plaintiffs' residence is the residence of a sex 
 offender, neither [Nelson nor Ryan] can identify any individual who believed 
 that either of them was a registered sex offender as a result of having read 
 the [News Leader]." (Disputed. "Plaintiffs identify Belinda Ramsey as an 
 individual who believed that either Mr. Nelson or Mrs. Ryan was a registered 
 sex offender as a result of reading it in the [News Leader], and was not 
 convinced otherwise until she checked with the Sheriff's Department.")
 9. Plaintiffs did not allege any special damages or offer any evidence of 
 special damages. (Disputed. "Plaintiffs allege special damages in that the 
 subject publication caused members of the community to target them with 
 gunfire, vandalism, and harassment, and that in response to this they were 
 compelled to upgrade their video surveillance 
equipment.")
¶8 Defendants argue that the article in question "is 
constitutionally-protected speech on a matter of public concern, and is 
substantially true and privileged" and Plaintiffs therefore cannot recover under 
a theory of libel or negligence. They also assert Plaintiffs, as a matter of 
law, cannot maintain a claim for negligence based on this publication and 
"cannot maintain a separate cause of action for Punitive Damages."
¶9 In response, Plaintiffs set out their own statement of undisputed material 
facts. Plaintiffs state that in the June 14, 2009, edition of the News Leader, 
Defendants listed Plaintiffs' address as that of Donald Crown, a registered sex 
offender. Defendants do not dispute this fact but dispute the other 16 facts 
recited below that Plaintiffs list as undisputed.
¶10 Plaintiffs claim that Defendants admit that the incorrect information was 
a result of the News Leader's error and not that of the reporting law 
enforcement agencies. According to Plaintiffs, although Ryan spoke to Ramsey on 
June 15, 2009, informed her of the error, and asked Ramsey to provide a 
conspicuous correction, Defendants left the incorrect sex offender edition of 
the newspaper on its website until October 31, 2009. Plaintiffs claim that 
someone fired an automatic rifle at or near their residence on the morning of 
June 14, 2009, and that between the hours of 7:00 p.m., and midnight that day, 
several vehicles drove past Plaintiffs' residence. Plaintiffs have video 
evidence of an occupant of a pick-up truck driving past the residence that day 
yelling, "Pervert." They provided Defendants with video evidence of a white 
pick-up truck driving by the residence on July 22, 2009, "blaring its horn" and 
video footage showing a black truck driving by on April 20, 2010, with an 
occupant yelling, "Freaks." Additional video footage showed someone firing 
gunshots at or near the residence on August 6, 2010, and August 27, 2010, and a 
white pick-up blaring its horn on September 17, 2010. Further video footage was 
provided showing someone breaking out Plaintiffs' lights at the entrance of 
their property on February 10, 2011, the driver of a red pick-up driving by on 
July 22, 2011, and extending his middle finger, a black pick-up driving by and 
blaring its horn on August 9, 2011, the driver of a white pick-up pointing a 
pistol at the residence on July 21, 2011, and the driver of a silver SUV 
breaking out the lights at the entrance to Plaintiffs' property on September 15, 
2011. Plaintiffs allege they purchased new video surveillance equipment on 
January 7, 2011.
¶11 The trial court granted summary judgment in favor of Defendants by 
holding that the alleged trespasses, vandalism, and harassment were not caused 
by errors or omissions of Defendants and that Plaintiffs' damages were the 
result of intervening causes. It further found that Plaintiffs were not 
mentioned in the newspaper article and that there was only a mistake of address. 
The court held "[t]hat as a matter of law the Defendant newspaper getting the 
address wrong and then issuing a correction in the next publication is not libel 
per se." The court stated, "That we need matters like this published in 
the paper." The court further held that "the standard for the Plaintiffs to 
properly state a claim for punitive damages against the Defendant newspaper is 
actual malice, and that Plaintiffs did not meet this burden."
¶12 Plaintiffs appeal.
STANDARD OF REVIEW
¶13 Summary judgment is properly granted "when the pleadings, affidavits, 
depositions, admissions or other evidentiary materials establish that there is 
no genuine issue as to any material fact and that the moving party is entitled 
to judgment as a matter of law." Davis v. Leitner, 1989 OK 146, ¶ 9, 782 P.2d 924. When reviewing a grant 
of summary judgment, we must view all inferences and conclusions to be drawn 
from the evidentiary materials in a light most favorable to the party opposing 
the motion. Id.
¶14 An appeal from an order granting summary judgment is subject to de 
novo review. Shull v. Reid, 2011 OK 72, ¶ 3, 258 P.3d 521. "In its 
re-examination of the trial tribunal's legal rulings an appellate court 
exercises plenary, independent and nondeferential authority." Bronson 
Trailers & Trucks v. Newman, 2006 OK 46, ¶ 5, 139 P.3d 885.
ANALYSIS
¶15 Plaintiffs list the following issues to be addressed on appeal: (1) 
whether the record supported summary judgment, (2) whether summary judgment was 
premature, (3) whether the trial court erred in finding that Defendants' actions 
were not libel per se, (4) whether the trial court's conclusion regarding 
intervening cause was reversible error because that issue was not raised or 
briefed by either party, (5) whether the trial court's holding regarding the 
standard for punitive damages was reversible error, and (6) whether the trial 
court made a statement that indicated bias in favor of the news media. With the 
exception of the sixth issue, all of the issues raised are comprised within the 
fundamental question of whether summary judgment was properly granted in 
Defendants' favor.
I. Negligence Claim
¶16 Plaintiffs assert claims against Defendants for negligence, libel, and 
punitive damages. In their negligence claim, they assert Defendants "failed to 
use ordinary care in confirming, updating, and disseminating registered sex 
offender information to the public through both their newspaper . . . and their 
website."
¶17 After review of the record and pertinent authority, we conclude as a 
matter of law that Plaintiffs cannot state a separate claim of negligence 
against Defendants. We agree with Defendants, as stated in their motion for 
summary judgment and supporting brief, that "'[n]egligence' is the standard of 
fault that a private figure plaintiff must ultimately prove in a libel case that 
goes to trial, but 'negligence' is not an independent tort theory based on 
publication of a newspaper article."
¶18 In support of their argument, Defendants cite Jordan v. World 
Publishing Company, 1994 OK CIV 
APP 30, 872 P.2d 946, in 
which the principal of a public school brought suit against a newspaper for 
negligence after the newspaper printed a letter to the editor that the plaintiff 
claimed the newspaper falsely attributed to the principal. The principal, a 
public figure, sought to recover against the newspaper for negligence in 
publishing the letter with its false attribution and for negligent infliction of 
emotional distress; he did not plead actual malice after being given an 
opportunity to amend his petition. The newspaper argued that the nature of the 
action was for libel, or false light invasion of privacy, both of which require 
a finding of malice before liability could attach against a newspaper for 
damages to a public figure. Id. ¶ 8. The trial court agreed and dismissed 
the action. Id. ¶ 4.
¶19 On appeal, this Court held that because the substance of the plaintiff's 
claim was a false publication and he was without dispute a public figure, the 
plaintiff was constitutionally required in a libel action like this to plead and 
prove actual malice. Id. ¶ 14. The Court further noted that, pursuant to 
Colbert v. World Publishing Co., 1987 OK 116, 747 P.2d 286, "a plaintiff in false 
light privacy cases must plead and prove actual malice." Id. ¶ 9. The 
Jordan Court found its case very similar to "Decker v. Princeton 
Packet, 116 N.J. 418, 561 A.2d 1122 (1989)" in which the New Jersey Court 
held that "'the first amendment requires that plaintiff establish at least the 
same level of intent to recover for the infliction of emotional harm as is 
necessary to find defamation.'" Jordan, 1994 OK CIV APP 30, ¶ 11.
¶20 We decline to follow Jordan in all aspects because Plaintiffs here 
are clearly private persons and not subject to the same strictures of pleading 
and proof as a public figure like Jordan. But we concur with the underlying 
premise in Jordan that when the nature of the action is a libel claim, 
the importance of protecting newspapers' First Amendment rights requires 
adherence to the standards for defamation claims. To apply any lesser standard, 
such as that for a negligence claim, would, to restate Decker as quoted 
in Jordan, allow the use of the tort of negligence to circumvent defenses 
to defamation actions, including shorter statute of limitations provisions, and 
to overcome "'judicial barriers to punitive damages'" applicable in defamation 
cases. Id. ¶ 11.
¶21 Other cases have concluded that a plaintiff could not recast a defamation 
claim as a different tort claim. See e.g., Grogan v. KOKH, LLC, 2011 OK CIV APP 34, ¶ 33, 256 P.3d 1021 (agreeing with 
Jordan "that one cannot circumvent the First Amendment by the label with 
which the suit is described") and Stewart v. KFOR-TV, 2006 WL 517656 
(W.D. Okla. 2006)(citing Jordan and concluding the plaintiff could not 
rely on the same set of facts to recast a defamation claim as a negligence 
claim).
¶22 Because Plaintiffs' allegations of wrongdoing under any theory of 
recovery involve the gathering and dissemination of information in Defendants' 
newspaper and on their website, Plaintiffs' negligence claim is not viable as a 
separate claim. The entry of summary judgment on this question is affirmed. 
However, this does not preclude Plaintiffs' defamation claim arising from the 
same allegations of fact.
II. Libel Claim 
A. Defamatory Statement
¶23 In their claim for libel, Plaintiffs assert that Defendants "failed to 
use ordinary care of those similarly engaged in print and electronic media in 
confirming, updating, and disseminating registered sex offender information to 
the public through both their newspaper . . . and their website." They allege 
Defendants "disseminated a false claim that the Plaintiffs' address was that of 
a registered sex offender."
¶24 For a private figure to state a claim for defamation, he or she must 
show:

 
 "(1) A false and defamatory statement, (2) an unprivileged publication to 
 a third party, (3) fault amounting at least to negligence on the part of the 
 publisher; and (4) either the actionability of the statement irrespective of 
 special damage [per se], or the existence of special damage [per 
 quod]."
White v. City of Del City, 2012 OK CIV APP 5, ¶ 21, 270 P.3d 205 (quoting Tanique, 
Inc. v. State ex rel. Okla. Bureau of Narcotics and Dangerous Drugs, 2004 OK CIV APP 73, ¶ 29, 99 P.3d 1209). It is undisputed 
that the statement in question was false and that it was published to third 
parties. Whether it was defamatory to Plaintiffs, whether it was privileged, and 
what standard of conduct applies to Defendants in this situation remain 
questions requiring discussion.
¶25 "A communication is defamatory if it tends to so harm the reputation of 
another as to lower him in the estimation of the community or to deter third 
persons from associating or dealing with him." Herbert v. Oklahoma Christian 
Coal., 1999 OK 90, n. 4, 992 P.2d 322. Plaintiffs submitted 
evidence that they suffered harassment, abuse, and property damage from the 
public after the publication of their address as that of a sex offender. They 
allege that the harassment and damage were the result of the perpetrators 
believing that a sex offender lived in their home. Whether the harassment and 
vandalism resulted from the publication of their address as that of a sex 
offender is a question of fact.
¶26 "In order for a false statement to be defamatory, it must concern the 
plaintiff." Gonzalez v. Sessom, 2006 OK CIV APP 61, ¶ 12, 137 P.3d 1245. "A defamatory 
communication concerns the plaintiff if the recipient either correctly, or 
mistakenly but reasonably, understands that it was intended to refer to the 
plaintiff." Id. (citing Restatement (Second) of Torts § 564 (1977)). 
Section 564 of the Restatement (Second) of Torts provides, "A defamatory 
communication is made concerning the person to whom its recipient correctly, or 
mistakenly but reasonably, understands that it was intended to refer." Comment 
b. to § 564 provides, in part, the following:

 
 Person mistakenly but reasonably believed to be intended. If the 
 communication is reasonably understood by the person to whom it is made as 
 intended to refer to the plaintiff, it is not decisive that the defamer did 
 not intend to refer to him. (But see Comment f). It is not enough 
 however, that the defamatory matter is actually understood as intended to 
 refer to the plaintiff; the interpretation must be reasonable in the light 
 of all the circumstances. It is not necessary that the plaintiff be 
 designated by name; it is enough that there is such a description of or 
 reference to him that those who hear or read reasonably understand the 
 plaintiff to be the person intended.
(Emphasis added.)
¶27 Comment f. provides:

 
 Nature of defamer's conduct. As indicated in § 580B the defamer is 
 subject to liability if he knew that the communication would be understood 
 by the recipient to refer to the plaintiff or was negligent in failing to 
 recognize that this might happen. If the recipient reasonably understood the 
 communication to be made concerning the plaintiff, it may be inferred that 
 the defamer was negligent in failing to realize that the communication would 
 be so understood.
 The common law position was that if the recipient reasonably understood 
 the communication to be made concerning the plaintiff, the defamer was 
 subject to liability even though he was not at fault either because he 
 intended the reference to the plaintiff or because he was negligent in 
 failing to realize that his communication would be so understood by the 
 recipient. This position is now held to be in violation of the First 
 Amendment to the Constitution. The Supreme Court holds that there must be 
 intent, recklessness or negligence on the part of the defamer. (See § 580B). 
 It is therefore necessary for the plaintiff to prove that a reasonable 
 understanding on the part of the recipient that the communication referred 
 to the plaintiff was one that the defamer was negligent in failing to 
 anticipate. This is particularly important when the recipient knew of 
 extrinsic facts that make the communication defamatory of the plaintiff but 
 these facts were not known to the defamer.[1]
(Emphasis added).
¶28 Here, Defendants printed Plaintiffs' address as the address of a sex 
offender, and they contend that publication of Plaintiffs' address was a 
typographical error.[2] No one maintains that a sex offender actually lives 
at the address listed by the News Leader. However, a reader of the News Leader 
could have understood the sex offender listing to refer to Roy Nelson, because 
he was a male living at the address listed in the News Leader as housing a sex 
offender. And, Plaintiffs allege that the picture of the sex offender, Donald 
Crown, published in the newspaper "was distorted so that it could be mistaken 
for Mr. Nelson." Similarly, a reader could have understood that Susan Ryan, as a 
resident at the address listed, was sharing the residence with a sex 
offender.
¶29 We conclude that Plaintiffs have shown that the communication in the 
newspaper that a sex offender lived at Plaintiffs' address could reasonably be 
understood by a recipient to refer to Plaintiffs, either as the sex offender 
himself in the case of Nelson or as someone housing or residing with a sex 
offender in the case of Ryan, and further that Defendants could reasonably be 
regarded as negligent in failing to recognize that this might happen when they 
published the addresses of sex offenders in the county. See Restatement 
(Second) of Torts § 564, cmt. b. (1977).
¶30 The News Leader's reference to Plaintiffs' home could also reasonably be 
regarded as a defamatory statement "concerning" Plaintiffs. For example, in 
Michaels v. Gannett Co., 199 N.Y.S.2d 778 (N.Y. App. Div. 1960), a 
newspaper article identified the plaintiff as living at his correct address but 
incorrectly stated that he owed $133,239.88 in unpaid taxes. Id. at 
779-80. The court stated, "A jury would have been justified in finding that the 
article tended to expose the person to whom it referred to 'hatred, contempt or 
aversion,' or that it tended 'to induce an evil or unsavory opinion of him in 
the minds of a substantial number of the community.'" Id. at 780. The 
court found that it was immaterial that the newspaper did not intend to refer to 
the plaintiff or that the newspaper's publication of the plaintiff's address was 
a mistake. Id. at 780.
¶31 In Fitzpatrick v. Age-Herald Publishing Company, 63 So. 980, 980 
(Ala. 1913), the Supreme Court of Alabama addressed whether the following 
statement in a newspaper constituted libel: "'The shooting occurred on Avenue E, 
between Eleventh and Twelfth streets, in a house which bears a bad reputation 
with the police.'" The plaintiff, who lived in the house identified by the 
article, alleged that he was greatly humiliated by the article and that his 
reputation was greatly impaired. Id. One question before the Court was 
whether the statement constituted libel of the plaintiff or of the house where 
he resided. Id. The Court answered this question with the following:

 
 The house acquires whatever reputation it has from the occupants thereof; 
 it can make or earn none for itself; it can and does reflect only the 
 reputation of its occupants, or those who frequent it. We know of no way by 
 which a house can, of its own act, acquire a reputation. This being true, 
 when we speak of a certain house as being disorderly, we must necessarily be 
 understood as referring to the conduct of those who live in, or who 
 frequent, the same by and with the permission of the occupants. When, 
 therefore, it is said of a house, "It has a bad reputation with the police," 
 we refer to the head of that house, and, in fact, we reflect upon each 
 member of the same. The language of the publication is, "The shooting 
 occurred on Avenue E, between Eleventh and Twelfth streets, in a house which 
 bears a bad reputation with the police." This charges that, at the present 
 time, the house bears a bad reputation with the police; and, under the 
 plaintiff's averment, it was at that moment of time, and had been for a long 
 while prior thereto, the place where he and his family resided. This 
 reflected upon the plaintiff, for he and his family must be held to be the 
 ones who gave to the house, and continued to give to it, that reputation, 
 for the house is void of life and could not make for itself a bad 
 reputation.
Id. at 981 (emphasis added). The Court concluded "that the publication 
in question was 'of and concerning' the plaintiff, who resided in the house in 
question." Id. The Court also stated:

 
 The published words did not, it is true, charge the plaintiff, or any 
 member of his family, with an indictable offense; but, giving to the 
 publication the meaning that the words employed generally and fairly import, 
 it tended to subject the plaintiff, the head of the house, to public hatred, 
 contempt, or ridicule, and tended to reflect shame upon him, and to put him 
 without the pale of social intercourse. This being true, the words were 
 libelous per se.
Id. at 982.
¶32 Although these cases from other jurisdictions are not controlling, they 
offer insight into how reference to an address can reflect negatively on the 
owner or occupant of that address. We are persuaded that Plaintiffs have raised 
sufficient questions of fact on which "reasonable persons might reach different 
inferences or conclusions," Buck's Sporting Goods, Inc. of Tulsa v. First 
National Bank & Trust Co. of Tulsa, 1994 OK 14, ¶ 11, 868 P.2d 693, as to whether the 
statement was of and concerning Plaintiffs and therefore defamatory.
B. Privilege 
1. Fair Comment
¶33 Defendants next assert that the publication was protected by both 
statutory and common law privilege. The trial court found "[t]hat we need 
matters like this published in the paper," a statement appearing to invoke the 
concept of privilege afforded to published statements involving matters of 
legitimate public interest.
¶34 "Fair comment is a common law defense to a defamation action. The 
principle affords legal immunity for comment by any and all members of the 
public and extends to virtually all matters of legitimate public 
interest. Its purpose is to promote the free and open exchange of ideas." 
Magnusson v. New York Times Co., 2004 OK 53, ¶ 9, 98 P.3d 1070. In Magnusson, 
the Oklahoma Supreme Court said: 

 
 The common law fair comment privilege extends to fair expressions on 
 matters of public interest. It differs from both: 1) the common law fair 
 report privilege--which affords a qualified or conditional privilege to the 
 media when they republish defamatory material in an account of a public or 
 official proceeding, i.e., judicial proceedings, legislative 
 sessions, judicial hearings, or official news conferences; and 2) its 
 statutory counterpart, 12 O.S. 
 2001 §1443.1--which embodies a similar statutory privilege as a complete 
 defense to libel. Although all three concepts overlap, the scope of the 
 common law fair comment privilege, encompassing expressions of opinion on 
 all matters of public opinion, is broader than either the common law fair 
 report doctrine or the terms of the statute--both of which have their roots 
 in political speech concepts and encompass public interest reports of 
 official actions or proceedings.
Id. ¶ 10. The Court applied the common law defense of fair comment to 
a statement representing "the actual opinion of the speaker" on a matter of 
public concern. Id. ¶ 11. If a statement about an individual can be 
proven true or false, it is not an opinion. Id. ¶ 13. The sex offender 
information published by the News Leader here was not a statement or expression 
of opinion, and cannot be reasonably construed as such, and the fair comment 
privilege therefore does not apply.
2. Fair Report
¶35 As to the common law fair report privilege, the Oklahoma Supreme Court in 
Wright v. Grove Sun Newspaper Co., Inc., 1994 OK 37, ¶ 8, 873 P.2d 983, explained as 
follows:

 
 The elements of the common-law fair report privilege, drawn from 
 the seventeenth and eighteenth century English developments, are defined in 
 the RESTATEMENT (SECOND) OF TORTS § 611. The text of that section is:
 The publication of defamatory matter concerning another in a report of an 
 official action or proceeding or of a meeting open to the 
 public that deals with a matter of public concern is privileged if the 
 report is accurate and complete or a fair abridgement of the occurrence 
 reported. [Emphasis added.]
 The privilege is not conditioned upon the truth or falsity of the 
 reported material, the character of the defamed person, nor on the 
 newsworthiness of the event; rather, its applicability is determined by the 
 nature of the occasion at which the republished material was secured 
 for news coverage. The critical occasion here is the district attorney's 
 news conference--a legitimate activity of his office, open to the public and 
 held for the purpose of addressing a matter of general concern to the 
 community. As the privilege is qualified, its abuse and loss would 
 occur if the newspaper does not accurately and fairly 
 republish that which was gathered from a public meeting, or if the 
 republished material is not of general public 
interest.
¶36 Although the information in the present article apparently came from law 
enforcement sources, it is not clear whether this publication constitutes a 
report of an official action, proceeding or meeting. As stated above in 
Wright, the applicability of the fair report privilege depends on "the 
nature of the occasion at which the republished material was secured for 
news coverage." Id. ¶ 8. This cannot be ascertained from the record 
before us and remains to be determined.
¶37 If we assume the published information is of public concern and could be 
said to have resulted from judicial or other official proceedings and therefore 
constitutes "a report" subject to the fair report privilege, the question of 
whether the report was fair, accurate and complete remains a fact question to be 
determined. Stewart v. NYT Broadcast Holdings, LLC, 2010 OK CIV APP 89, ¶ 19, 240 P.3d 722 ("Whether the reports 
were substantially accurate presented a question for the jury to 
determine.").
3. Title 12, Section 1443.1
¶38 Defendants also argue that the publication is protected by either the 
statutory "fair report" or the "fair comment" privilege provided by 12 O.S. § 1443.1.[3] The News Leader states that 
the sex offender information that it published was given to it by the Logan 
County Sheriff's office and the City of Guthrie Police Department. As discussed 
above, the published material complained of is not an expression of opinion, and 
the statutory fair comment privilege, like its common law counterpart, does not 
apply. Whether the statutory fair report privilege in § 1443.1, like its common 
law counterpart discussed above, applies in this instance cannot be resolved as 
a matter of law and remains to be determined.
C. Defendants' Conduct
¶39 As to the element of Defendants' conduct, Plaintiffs, to establish their 
claim for defamation as private persons, must also prove fault on the part of 
the publisher at least amounting to negligence. In Malson v. Palmer 
Broadcasting Group, 1997 OK 
42, ¶ 9, 936 P.2d 940, 
the Oklahoma Supreme Court reiterated "that the news media must exercise 
ordinary care in reporting news stories concerning private individuals." 
Ordinary care is "'that degree of care which ordinarily prudent persons engaged 
in the same kind of business usually exercise under similar circumstances.'" 
Id. (quoting Martin v. Griffin Television, Inc., 1976 OK 13, ¶ 23, 549 P.2d 85). A "'failure to 
exercise such ordinary care would be negligence.'" Id.
¶40 It is not disputed that the News Leader made an error in the publication 
of the sex offender information as it pertains to Plaintiffs. But whether the 
News Leader exercised ordinary care in its publication of this information 
cannot be settled as a matter of law. "[T]he best evidence of ordinary [] 
care is the degree of care which ordinarily prudent persons, engaged in the same 
kind of business, customarily have exercised and commonly do exercise under 
similar circumstances." Malson, 1997 OK 42, ¶ 10. Plaintiffs are 
entitled to present evidence on this question to the trier of fact to show that 
the News Leader failed to exercise ordinary care in these circumstances. The 
exercise of ordinary care may be established by evidence of the custom and 
practice in the print media or newspaper business. Id. "The degree of 
care that an ordinary person should exercise in a given situation normally 
presents an issue for the jury." Id. ¶ 12. Because facts remain in 
dispute about whether ordinary care was exercised under the circumstances, we 
conclude the trial court's grant of summary judgment in favor of Defendants on 
Plaintiffs' defamation claim cannot be sustained.
D. Libel Per Se
¶41 There are several remaining issues raised by Plaintiffs on appeal 
regarding their libel claim. Libel is defined by statute as:

 
 a false or malicious unprivileged publication by writing, printing, 
 picture, or effigy or other fixed representation to the eye, which exposes 
 any person to public hatred, contempt, ridicule or obloquy, or which tends 
 to deprive him of public confidence, or to injure him in his occupation, or 
 any malicious publication as aforesaid, designed to blacken or vilify the 
 memory of one who is dead, and tending to scandalize his surviving relatives 
 or friends.
12 O.S.2011 § 1441. "A 
publication is libelous per se (when the defamatory impact is apparent on 
its face) if it 'exposes any person to public hatred, contempt, ridicule or 
obloquy, or which tends to deprive him of public confidence, or to injure him in 
his occupation. . . .'" Gaylord Entm't Co. v. Thompson, 1998 OK 30, ¶ 35, 958 P.2d 128 (quoting 12 O.S.1991 § 1441). "To determine 
whether a publication is libelous per se, the writing must be measured by 
its natural and probable effect upon the mind of the average lay reader." Id. 
¶ 35.
¶42 Unlike libel per se where the publication is susceptible only to a 
defamatory meaning, a "publication is deemed libelous per quod if the 
words are reasonably susceptible of both a defamatory and an innocent meaning," 
meaning that extrinsic facts are required to show a defamatory meaning. 
Id. ¶ 35. "Whether a writing is libelous per se presents an issue 
of law for the trial court's resolution." Id. "A fact determination, if 
necessary to decide whether a publication is libelous per quod, is for 
the jury." Id.
¶43 The trial court here held that "as a matter of law the Defendant 
newspaper getting the address wrong and then issuing a correction in the next 
publication is not libel per se." Based on the nature of the publication 
here and the standard to be applied in ascertaining whether it is libelous 
per se, this conclusion cannot as a matter of law be upheld. One could 
reasonably conclude that the impact of the publication of Plaintiffs' address as 
that of a convicted sex offender is apparent on its face and susceptible of but 
one opprobrious meaning, can be "measured by its natural and probable effect 
upon the mind of the average lay reader," Id. ¶ 35, and could expose 
Plaintiffs to public hatred or contempt. Whether it is susceptible of a 
different, innocent meaning is an issue for the trial court. If otherwise found 
actionable after consideration of the elements discussed above[4], whether the publication of 
Plaintiffs' address constitutes libel per se or libel per quod 
must be addressed on remand.[5]
III. Punitive Damages
¶44 On the question of punitive damages, Plaintiffs stated in their response 
and objection to the motion for summary judgment, "if there is no finding of 
liability against the Defendant, then punitive damages will not stand as a 
separate cause of action." Plaintiffs are correct that punitive damages do not 
constitute a separate cause of action, but not for the reason argued--this 
conclusion is not dependent on a finding of "no liability." Punitive damages, 
like compensatory damages, do not stand alone as a separate cause of action; 
they constitute an element of damage subject to proof in connection with 
Plaintiffs' cause of action for libel.
¶45 Although punitive damages do not constitute a separate cause of action, 
this does not preclude Plaintiffs from seeking their recovery subject to 
appropriate supporting evidence and proper instructions. The issue of punitive 
damages must be addressed if Plaintiffs present sufficient evidence to meet the 
standard for their recovery, and the entry of summary judgment on this issue was 
premature.
¶46 It is conceded that Plaintiffs are not public figures but private 
persons. Pursuant to Martin v. Griffin Television, Inc., 1976 OK 13, ¶ 28, 549 P.2d 85, the standard of actual 
malice is to be applied for the recovery of punitive damages where the defamed 
party is a private person. The actual malice standard requires the defendant to 
have acted with knowledge that the publication was false, or with reckless 
disregard for whether it was false. [6] Id. 
¶47 Because we reverse the summary judgment entered on Plaintiffs' libel 
claim, the issue of punitive damages with its requisite burden of proof in 
regard to a libel claim by private persons must be revisited on remand.
IV. Code of Judicial Conduct
¶48 Finally, Plaintiffs cite two provisions of the Code of Judicial Conduct 
which they contend the trial court violated. Rule 2.2 of the Code of Judicial 
Conduct, 5 O.S.2011, ch. 1, app. 4, provides, "A judge shall uphold and apply 
the law, and shall perform all duties of judicial office fairly and 
impartially." Rule 2.4 of the Code of Judicial Conduct, 5 O.S.2011, ch. 1, app. 
4, provides:

 
 (A) A judge shall not be swayed by public clamor or fear of 
criticism.
 (B) A judge shall not permit family, social, political, financial, or 
 other interests or relationships to influence the judge's judicial conduct 
 or judgment.
 (C) A judge shall not convey or permit others to convey the impression 
 that any person or organization is in a position to influence the 
 judge.
Plaintiffs ask this Court to resolve the issue of "[w]hether the District 
Judge's statement that both he and his son were Journalism Majors prior to the 
initiation of the proceedings . . . was an indication or manifestation of bias 
in favor of the news media" in violation of the Code of Judicial Conduct. We 
decline to find that this statement alone regarding a college major indicates 
bias in favor of the news media.
CONCLUSION
¶49 Although we conclude that Plaintiffs cannot assert a separate cause of 
action for negligence arising from this publication, we further conclude that 
material issues of fact remain that preclude the entry of judgment as a matter 
law in favor of Defendants on Plaintiffs' libel claim. Accordingly, we affirm in 
part and reverse in part the order of the trial court granting summary judgment 
and remand the case for further proceedings on Plaintiffs' libel claim 
consistent with this Opinion.

¶50 AFFIRMED IN PART, REVERSED IN PART AND REMANDED FOR FURTHER 
PROCEEDINGS.

BARNES, C.J., and THORNBRUGH J. (sitting by designation), concur.

FOOTNOTES

[1] 
Restatement (Second) of Torts § 580(B) (1977) provides:
One who publishes a false and defamatory communication concerning a private 
person, or concerning a public official or public figure in relation to a purely 
private matter not affecting his conduct, fitness or role in his public 
capacity, is subject to liability, if, but only if, he
(a) knows that the statement is false and that it defames the other,
(b) 
acts in reckless disregard of these matters, or
(c) acts negligently in 
failing to ascertain them.

[2] The 
affidavits of both Belinda Ramsey and Nixie Goff submitted in support of 
Defendants' motion for summary judgment state that Goff typed the 97 names and 
addresses into the News Leader's computer system and printed out the list which 
was then proofread by Goff, Ramsey, and one other staff member. Both Goff and 
Ramsey then compared the printout to the original list before the names and 
addresses were published on June 14, 2009. R., tab 6.

[3] Title 
12 O.S.2011 § 1443.1 
provides:
A. A privileged publication or communication is one made:
First. 
In any legislative or judicial proceeding or any other proceeding authorized by 
law;
Second. In the proper discharge of an official duty;
Third. By a fair 
and true report of any legislative or judicial or other proceeding authorized by 
law, or anything said in the course thereof, and any and all expressions of 
opinion in regard thereto, and criticisms thereon, and any and all criticisms 
upon the official acts of any and all public officers, except where the matter 
stated of and concerning the official act done, or of the officer, falsely 
imputes crime to the officer so criticized.
B. No publication which under 
this section would be privileged shall be punishable as libel.

[4] As 
discussed previously in this Libel Claim section, for a private figure to state 
a claim for defamation, he or she must show:
"(1) A false and defamatory statement, (2) an unprivileged publication to a 
third party, (3) fault amounting at least to negligence on the part of the 
publisher; and (4) either the actionability of the statement irrespective of 
special damage [per se], or the existence of special damage [per quod]."
White v. City of Del City, 2012 OK CIV APP 5, ¶ 21, 270 P.3d 205 (quoting Tanique, 
Inc. v. State ex rel. Okla. Bureau of Narcotics and Dangerous Drugs, 2004 OK CIV APP 73, ¶ 29, 99 P.3d 1209).

[5] At the 
hearing on Defendants' motion for summary judgment, counsel for the parties 
discussed the question of other, non-opprobrious meanings. However, after 
concluding that the statement was not libelous per se, the trial court's 
order failed to address whether the statement could be found to be libelous 
per quod.

[6] 
Plaintiffs argue that the News Leader's lack of any "standard policies and 
procedures for ensuring the accuracy of any of the information it disseminates" 
is reckless, as well as its insufficient retraction or "level of correction" of 
the error published in the paper and its failure for four months to correct the 
false publication on its website.





 Citationizer© Summary of Documents Citing This Document
Cite
 Name
 Level
 None Found.
Citationizer: Table of Authority
Cite
 Name
 Level
 Oklahoma Court of Civil Appeals Cases Cite
Name
Level 1994 OK CIV APP 30, 872 P.2d 946, 65 OBJ 1429, Jordan v. World Pub. Co.
Discussed at Length 2004 OK CIV APP 73, 99 P.3d 1209, TANIQUE, INC. v. STATE ex rel. OKLA. BUREAU OF NARCOTICS AND DANGEROUS DRUGS
Discussed at Length 2006 OK CIV APP 61, 137 P.3d 1245, GONZALEZ v. SESSOM
Discussed 2010 OK CIV APP 89, 240 P.3d 722, STEWART v. NYT BROADCAST HOLDINGS, L.L.C.
Discussed 2011 OK CIV APP 34, 256 P.3d 1021, GROGAN v. KOKH, LLC
Discussed 2012 OK CIV APP 5, 270 P.3d 205, WHITE v. CITY OF DEL CITY
Discussed at Length
Oklahoma Supreme Court Cases Cite
Name
Level 1987 OK 116, 747 P.2d 286, 58 OBJ 3303, Colbert v. World Pub. Co.
Discussed 1989 OK 146, 782 P.2d 924, 60 OBJ 2833, Davis v. Leitner
Discussed 1994 OK 14, 868 P.2d 693, 65 OBJ 449, Buck's Sporting Goods, Inc. of Tulsa v. First Nat. Bank & Trust Co. of Tulsa
Discussed 1994 OK 37, 873 P.2d 983, 65 OBJ 1328, Wright v. Grove Sun Newspaper Co., Inc.
Discussed 1997 OK 42, 936 P.2d 940, 68 OBJ 1454, Malson v. Palmer Broadcasting Group
Discussed at Length 1999 OK 90, 992 P.2d 322, 70 OBJ 3343, Herbert v. Oklahoma Christian Coalition, Inc.
Discussed 2004 OK 53, 98 P.3d 1070, MAGNUSSON v. NEW YORK TIMES CO. d/b/a KFOR
Discussed 2006 OK 46, 139 P.3d 885, BRONSON TRAILERS & TRUCKS v. NEWMAN
Discussed 2011 OK 72, 258 P.3d 521, SHULL v. REID
Discussed 1976 OK 13, 549 P.2d 85, MARTIN v. GRIFFIN TELEVISION, INC.)
Discussed at Length 1998 OK 30, 958 P.2d 128, 69 OBJ 1404, GAYLORD ENTERTAINMENT CO. v. THOMPSON
Discussed
Title 12. Civil Procedure Cite
Name
Level 12 O.S. 1441, Definition of Libel
Discussed 12 O.S. 1443.1, Privileged Communication Defined - Exemption from Libel
Discussed at Length