2010 OK CIV APP 89

**Linda STEWART, Plaintiff/Appellant,**

v.

**NYT BROADCAST HOLDINGS, L.L.C., and Griffin Communications, L.L.C., Defendants/Appellees.**

No. 107,015.

Court of Civil Appeals of Oklahoma, Division No. 3.

Aug. 23, 2010.

Babette Patton, Breathwit & Patton, Oklahoma City, OK, for Appellant.

Robert D. Nelon, Jon Epstein, Hall, Estill, Hardwick, Gable, Golden, & Nelson, Oklahoma City, OK, for Appellee NYT Broadcast Holdings, L.L.C.

S. Douglas Dodd, Michael Minnis, Jon E. Brightmire, Doerner, Saunders, Daniel & Anderson, Tulsa, OK, for Appellee Griffin Television OKC, L.L.C.

LARRY JOPLIN, Presiding Judge.

¶ 1 Plaintiff/Appellant Linda Stewart (Stewart) seeks review of the trial court's order denying her motion for new trial after a jury verdict for Defendants/Appellees NYT Broadcast Holdings and Griffin Communications (KFOR and KWTV, respectively) on Plaintiff's claims for defamation and false light invasion of privacy. In this appeal, Stewart asserts the broadcasts aired by Appellees were false and unprivileged, constituted libel per se, and the trial court erred in denying Stewart's motion for a new trial. Having reviewed the record, we find no error as alleged. We consequently hold the order of the trial court and the jury verdict should be, and hereby is, affirmed.

¶ 2 On July 3, 2005, Roger Tyler (Tyler) reported to the Norman Police Department (NPD) that his wallet containing credit cards, a debit card, and other items was stolen from his vehicle. Shortly after the theft, Tyler cancelled his credit and debit cards and asked his bank for records indicating where his ATM card was used. The records showed someone unsuccessfully attempted to use the debit card at an ATM inside the Goldsby Gaming Center (GGC) at 11:06 A.M. that same day, as well as other attempted uses.

¶ 3 Tyler relayed the information to NPD, who assigned Detective Ben Davison to the case. On July 8, 2005, Detective Davison requested surveillance video of the ATM in GGC from 11:00 A.M. to 11:10 A.M. Unfortunately, GGC gave Detective Davison video from a different time frame showing one unidentified woman using a card at the ATM.

The NPD showed the video to Tyler, who did not recognize the woman.

¶ 4 On July 27, 2005, Lieutenant Tom Easley[1] issued a press release in conjunction with the NPD's Crime Stoppers Program, and requested the media's help in circulating the surveillance video to the public and identify the female suspect. Easley also spoke to various reporters on camera, including KFOR's Jack Damrill and KWTV's Dave Jordan. In Easley's press release and public statements to the press, he reported that the theft occurred in Norman, that the fraudulent attempt to use Tyler's card happened at GGC, and referred to the unidentified woman as a suspect. Easley also said, "[the] unknown female suspect was down at the Goldsby Gaming Center and had used his [Tyler's] debit card to take cash out of an ATM." The NPD played the surveillance video on a monitor while KFOR and KWTV cameramen recorded it with their video cameras. The woman in the surveillance video was the only suspect in the theft.

¶ 5 Beginning on July 27, 2005, KFOR and KWTV broadcast reports about the theft. The reports included the surveillance video from GGC. Although the information the NPD provided to the media only referred to her as a suspect, KFOR referred to the woman in the video as a "thief," an "alleged thief," a "wallet snatcher," and a "suspect." KFOR also reported that the police believed it was not the suspect's first time to commit theft. KWTV's report referred to the woman as "an alleged thief trying to live it up on someone else's dime" and was "facing criminal charges in two separate cities."

¶ 6 After the broadcasts aired, several people approached Linda Stewart (Stewart), the woman later identified as the person in the video, concerning the reports. On July 29, 2005, Jim Russell (Russell), Stewart's neighbor, notified Stewart that KFOR showed her image in connection with the theft. That same day Stewart asked another neighbor, Robert Grimes (Grimes), if he had seen the reports. Grimes said he heard KFOR's report about a theft but was not watching the screen to see the surveillance video. Stewart

---

1. Now, Captain Easley.

did not believe Russell and brushed it aside knowing she did nothing wrong.

¶ 7 On August 3, 2005, Gaylon Stubblefield (Stubblefield), an acquaintance who viewed KWTV's broadcast, bumped into Stewart at GGC and inquired about the report. Stubblefield, surprised to see Stewart at the casino, thought she would have been in jail. Stubblefield testified at trial that he believed Stewart had committed the crime and his encounter with her at GGC reflected this belief.

¶ 8 After the broadcasts aired, NPD received information identifying the suspect as several different people, including Stewart. On August 4, 2005, Detective Davison went to Stewart's home and asked her several questions relating to the theft. Stewart, aware of the news reports, knew why Detective Davison came to her home but did not become concerned due to her innocence. The NPD did not charge Stewart with a crime and did not contact her further.

¶ 9 After Detective Davison's visit, Stewart called her husband, Danny Stewart (Mr. Stewart), who suggested she check her bank records to see if she, in fact, used the GGC ATM on July 3, 2005. On August 4, 2005, Stewart went to her bank and requested records which showed an ATM withdrawal at GGC on the date and time depicted on the video. Stewart began to cry, knowing she was the woman in the reports. That same day, Stewart notified her employer, Chickasaw Nation Newcastle Gaming Center, of the NPD's investigation. Later that evening, Mr. Stewart found KFOR's report online and showed it to Stewart, leaving her in a state of shock.

¶ 10 On August 5, 2005, Stewart's employer revoked her temporary gaming license and suspended her from work for a period of two months. On August 6, 2005, Stewart went to Access Medical Center complaining of sleep loss and depression due to erroneous news reports. The attending physician, Dr. Davis, prescribed antidepressants and sleeping pills. Dr. Davis also recommended counseling, but Stewart never sought additional treatment.

¶ 11 In July 2006, Stewart commenced the instant action against KFOR and KWTV (Defendants), claiming libel and false light invasion of privacy. After a six day trial, the jury returned a verdict in favor of both Defendants for claims of libel and false light invasion of privacy.

¶ 12 Stewart filed a motion for new trial. Stewart mainly complained the verdict in favor of the Defendants was not sustained by sufficient evidence and was contrary to law, arguing that Defendants' reports were false and unprivileged, constituting libel per se. The Defendants asserted that competent evidence supported the jury's verdict.

¶ 13 The trial court denied the Plaintiff's motion for a new trial. Plaintiff appeals.

¶ 14 In her first proposition of error, Plaintiff asserts the evidence supports a finding that the statements made by KWTV and KFOR were false and unprivileged, constituting libel per se, and the jury verdict in favor of the Defendants was contrary to law. 12 O.S. § 1441; 12 O.S. § 1443.1; *Johnson v. The Black Chronicle*, 1998 OK CIV APP 77, 964 P.2d 924; *Mitchell v. Griffin Television, L.L.C.*, 2002 OK CIV APP 115, 60 P.3d 1058. Defendant, KFOR, responds, arguing the jury verdict should be affirmed because there was competent evidence to support their finding in favor of KFOR. *Badillo v. Mid Century Insurance*, 2005 OK 48, ¶ 2, 121 P.3d 1080, 1088; *B–Star, Inc. v. Polyone Corporation*, 2005 OK 8, ¶ 13, 114 P.3d 1082, 1085. Defendant, KWTV, responds similarly, arguing there was sufficient evidence to support the jury's conclusion that the broadcast were not false and were privileged, and the verdict must be upheld. *Badillo v. Mid–Century Ins.*, 2005 OK 48, 121 P.3d 1080, 1088. Additionally, KWTV argues the Plaintiff only addresses two of the four elements she is required to prove and does not contend the other two elements lacked proof.

## PRIVILEGE

¶ 15 Of the common-law fair report privilege, the Restatement (Second) of Torts, § 611, states:

The publication of defamatory matter concerning another in a report of an offi-

cial action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

The fair report privilege does not provide the media with absolute immunity, but is an exemption from liability, whether the publication is true or false, so long as the nature of the occasion which was reported qualifies as an official action and the report accurately and fairly disseminates the information gathered on that occasion. *Wright v. Grove Sun Newspaper Co., Inc.,* 1994 OK 37, ¶ 8, 873 P.2d 983, 989. "It is enough that [the report] is substantially accurate, or ... its 'gist' or 'sting' is true." *Johnson v. The Black Chronicle, Inc.,* 1998 OK CIV APP 77, ¶ 11, 964 P.2d 924, 927; *Crittendon v. Combined Communications Corp.,* 1985 OK 111, ¶ 15, 714 P.2d 1026, 1029. Review of a jury verdict is extremely narrow, and the verdict must be upheld where there is any competent evidence reasonably tending to support the verdict. *Walker v. St. Louis–San Francisco Ry. Co.,* 1982 OK 25, ¶ 10, 646 P.2d 593, 597.

 ¶ 16 Easley's press release and press conference, held in conjunction with Crime Stoppers, was an official action because it was an official function of the Norman Police Department. As Public Information Officer (PIO), it was Easley's official duty to conduct the press conference. Police Departments regularly seek the public's help in identifying suspects or providing information relating to crimes against the community. It is a Police Department's primary function to solve or prevent crimes, and these types of press conferences are an official means to effectuate that function. Without the public's help, many crimes would go unsolved.

¶ 17 Easley, the NPD's liaison to the media, acted in his capacity as PIO when he issued the press release, invited the media to the press conference, asked the public's help in identifying the only suspect in the theft, and made statements concerning the facts of the case. We hold these acts fall within the "penumbra of the official duties" of Easley.

*Wright,* 1994 OK 37, ¶ 7, 873 P.2d at 988. Therefore, the press release and the press conference held in conjunction with Crime Stoppers were official actions, and, if accurate, the reports thereof by KFOR and KWTV fell within the scope of the fair report privilege.

 ¶ 18 As we have noted, the privilege attaches so long as the reports were a substantially accurate account of the information the Norman Police Department and Easley provided the media. *Johnson,* 1998 OK CIV APP 77, ¶ 11, 964 P.2d at 927. This is true even if the information provided by the police department later was shown to be false. The Defendants produced evidence showing the Norman Police Department was looking for a woman later identified as Stewart in connection with the theft of a wallet, and distributed surveillance video of her using what was believed to be Tyler's ATM card. The Plaintiff presented evidence showing Captain Easley only using the word "suspect" in the press release and press conference while the Defendants' used the word "thief" in their reports.

¶ 19 Whether the reports were substantially accurate presented a question for the jury to determine. The record contains competent evidence from which a jury could conclude the Defendants' reports were a substantially accurate account of the information they were given from the official press release and at the official press conference.

¶ 20 We therefore hold the trial court did not abuse its discretion in denying the Plaintiff's motion for a new trial. The order of the trial court is AFFIRMED.

BELL, V.C.J., and MITCHELL, J., concur.