OSCN Found Document:WILEY v. GRAY TELEVISION

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 WILEY v. GRAY TELEVISION
2024 OK CIV APP 16
Case Number: 120797
Decided: 12/07/2023
Mandate Issued: 05/23/2024
DIVISION II
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION II

Cite as: 2024 OK CIV APP 16, __ P.3d __

 

ERNEST WILEY, Plaintiff/Appellant,
v.
GRAY TELEVISION, INC., aka and/or dba KSWO-TV, a foreign company; JARRED BURK, and KELVIN MIZE, Defendants/Appellees,
and
FIDELITY COMMUNICATIONS CO., a foreign company; CABLE ONE, INC., a foreign company; BRIAN ALLDREDGE, and XYZ CORPORATION, a foreign or domestic company, Defendants.

APPEAL FROM THE DISTRICT COURT OF
COMANCHE COUNTY, OKLAHOMA

HONORABLE SCOTT D. MEADERS, TRIAL JUDGE

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS

A. Mark Van Paasschen, MVP LAW, LLC, Yukon, Oklahoma, for Plaintiff/Appellant

G. Rudy Hiersche, Jr., BLANEY, TWEEDY, TIPTON & HIERSCHE, PLLC, Oklahoma City, Oklahoma, for Defendants/Appellees

JANE P. WISEMAN, PRESIDING JUDGE:

¶1 Ernest Wiley appeals the trial court's summary judgment entered in favor of Gray Television, Inc., aka and/or dba KSWO-TV, Jarred Burk, and Kelvin Mize (collectively, Defendants)[1] and its denial of his motion to reconsider which we treat as a motion for new trial. The questions to be addressed on appeal in this libel action are whether summary judgment was granted in error and whether the denial of Wiley's motion for new trial was an abuse of discretion. We consider this appeal without further briefing pursuant to Oklahoma Supreme Court Rule 1.36, 12 O.S.2021, ch. 15, app. 1. After review, we conclude overruling the motion for new trial was an abuse of discretion because the question of whether the article in question was substantially accurate was for a jury to decide, and granting summary judgment in Defendants' favor was therefore erroneous. We reverse the orders of the trial court and remand for further proceedings.

FACTS AND PROCEDURAL HISTORY

¶2 Ernest Wiley filed suit against Defendants on May 12, 2020. Defendants filed a motion for summary judgment asserting the following six facts as undisputed. (1) The Comanche County District Attorney on March 14, 2018, filed "a Felony Information Sheet of Aggravated Possession of Child Pornography against [Wiley] containing information to base the charge." (2) The Information filing was based on Detective Kim Morton's February 20, 2018 affidavit for arrest warrant. (3) On March 19, 2018, Comanche County issued a felony arrest warrant for Wiley, but the warrant was not filed until March 21, 2018. (4) KWSO published an article on its website on March 21, 2018, based on the contents of the affidavit for arrest warrant and information sheet. (5) Defendants state that the article's information was taken directly from the information sheet and affidavit for arrest warrant. The article attached as an exhibit, referred to as Article 1, has a byline by Jarred Burke, and indicates it was published on March 21, 2018, at 9:42 CDT, and updated August 15 at 1:34 PM. Article 1 states:

LAWTON, Ok (RNN Texoma) -- A Lawton man is facing child pornography charges after he was linked to an FBI investigation.

52-year-old Ernest Wiley in [sic] facing a felony charge of aggravated possession of child pornography.

According to court documents, in mid-February an FBI agent was conducting an online investigation when he came across an IP address which was connected to pictures of child pornography. The agent was able to track the IP address to the home of Wiley which was located in the 7000 block of NW Baldwin in Lawton. The FBI agent contacted the Lawton Police Department and on March 24, the LPD Special Operations Division was able to execute a search warrant on the home. Investigators seized multiple electronic devices and turned them over to the OSBI for further examination.

On that same day, Wiley was interviewed by LPD detectives at the Lawton police station. At the time, Wiley allegedly admitted to looking at pornography but said he never intentionally looked at child porn. The court documents state that the detective working the case found a video on at least one device from Wiley's home which reportedly had a video depicting a nude infant in addition to the hundreds of images originally found by the FBI.

A warrant has been issued for the arrest of Wiley to face charges.

(6) Defendant KWSO published a second article on March 23, 2018. "The article . . . informed that [Wiley] had been arrested and that he faced charges of aggravated possession of child pornography and that [Wiley] was out of jail based on posting of a $15,000.00 bond. It was solely based on the information contained in court records." The attached article, which the parties refer to as Article 2, states:

March 23, 2018 at 1:55 AM CDT -- Updated August 14 at 7:50 AM

LAWTON, OK (KSWO) - A Lawton man sought by police for possession of child pornography will appear in court next month.

According to court records, 52-year-old Ernest Wiley was arrested Thursday. Authorities say an IP address linked to his home was connected to hundreds of images of child pornography--and FBI agents seized several electronic devices with the images on them.

Wiley faces charges of aggravated possession of child pornography, and is currently out on a 15-thousand dollar bond. He is set to appear in court near the end of April.

¶3 In their motion for summary judgment, Defendants assert their publications about Wiley are privileged and are therefore exempt from libel laws. Specifically, they assert the publications are exempt pursuant to the fair report privilege.

¶4 In his response to Defendants' motion for summary judgment, Wiley indicates he "Agreed" with Defendants' statements of undisputed facts numbered 1 through 5. Wiley disputes Defendants' fact number 6 citing Jarred Burk's deposition. Wiley states: "The article published by Gray TV dated March 23, 2018, 'Article 2', was not 'solely based on the information contained in the court records,' per Defendant Burk's own admissions. Further, Article 2 contained false statements for which there was no factual basis." (Citations to record omitted.)

¶5 Wiley cites Jarred Burk's deposition testimony in which Burk agreed that "the phrase 'and FBI agents seized' is an inaccurate statement." Burk explained the statement is "not a hundred percent accurate" because "[i]t should have been attributed to LPD and not FBI." Burk answered, "Yes," when asked if Article 2 "implie[d] that there were devices that had hundreds of images of child pornography on them." When asked, "Where does it say in any of these three court documents that the devices seized had hundreds of images of child pornography on them?," Burke replied, "It doesn't say that." He later admitted it is a false statement. Burk also testified that no images of child pornography were found on the devices that were seized. Burk admitted that the statement that the bond was $15,000 was also incorrect.

¶6 Wiley asserts in his response that the fair report exemption does not apply to Article 2 because it contains statements that are not accurate representations of the court documents on which Defendants claim they relied. Wiley filed a cross-motion for summary judgment on the issue of liability only.

¶7 At the hearing on Defendants' motion for summary judgment, Defendants' attorney acknowledged that the IP address associated with the child pornography was wrongly identified as Wiley's and belonged to another subscriber. Counsel for Defendants states:

I think, Your Honor, to properly understand it you have to look at March 23, 2018. That's when the IP address was given and we now know wrongfully that it was Mr. Wiley's address, it wasn't; but at the time this article was published everybody thought that it was. So the devices that the FBI looked at before they actually went out and gave to the Lawton Police Department to confiscate showed the images. So when the affidavit of Detective Morton recited, she recited that the FBI found images located on that IP address, everybody thought at that time the IP address was Mr. Wiley's.

Defendants' counsel acknowledges the IP address associated with the child pornography was incorrectly linked to Wiley's home by Cable One. Counsel further acknowledges that the statement contained in Article 2 that "'[a]uthorities say an IP address linked to his home was connected to hundreds of images of child pornography'" was eventually found to be false.

¶8 Wiley's counsel explained that the FBI discovered the images of child pornography through its remote monitoring of downloads. Wiley's counsel said that the FBI saved the images they found and "then contacted the cable company and said here's an IP address, we need a name and physical residential address associated with your cable company's IP address that was issued by a subpoena with the FBI." He continued, "As [Defendants' counsel] has stated and is part of the court records here in this county and part of the civil case actually, the cable company was negligent in providing the wrong person's [Mr. Wiley's] name and physical address in response to the FBI's subpoena." The FBI contacted the Lawton Police Department (LPD) to investigate. The LPD obtained a search warrant and removed numerous devices from Wiley's home to submit to the OSBI for forensic examinations. Wiley's counsel asserts, "There is nothing in this entire affidavit that refers to those devices being seized having anything on them whatsoever let alone child porn." He continues, "[T]here is no phrase in this entire arrest affidavit that says those devices were determined to have anything on them, nothing on them, 689 images of child porn on them."

¶9 Wiley's counsel says he has no problem with the first part of the statement before the hyphens in Article 2 that says, "Authorities say an IP address linked to his home was connected to hundreds of images of child pornography--and FBI agents seized several electronic devices with the images on them." He argues:

The issue occurs and what subjects KSWO to liability for libel begins after that double hyphen. "And FBI agents seize[d] several electronic devices with the images on them." That statement is unequivocal. That statement says the FBI seized devices and those devices had the images of child pornography on them. If this article were to be appropriately subject to the Fair Reporting Privilege, it would have to be a substantially correct account, to use KWSO's own argument. There is nothing substantially correct in any of the three court documents reviewed that says those electronic devices had images on them.

He notes Article 2 does not say the devices were suspected of having pornographic images on them. Instead, "This article says the devices that were seized did have those images on them because of the usage of the word with. And again, anyone reading that sentence is going to take away that those seized devices had the images on them. There is no other way to reasonably read that sentence." He notes that "the State of Oklahoma has stipulated to that on record in this courthouse that those devices did not have a single image of child porn on them."[2]

¶10 Although not in the record on appeal, we take judicial notice that Wiley was charged in State of Oklahoma v. Wiley, Comanche County Case No. CF-2018-156, with one count of aggravated possession of child pornography. During the criminal case, Wiley filed a motion asking the court to take judicial notice that Randy Wolfe was the correct subscriber of the IP address and had been charged with aggravated possession of child pornography and two counts of distribution of child pornography in State of Oklahoma v. Wolfe, Comanche County Case No. CF-2017-632. And Wiley asserted the OSBI had acknowledged it did not find child pornography on the devices seized from his home. The court ultimately dismissed the criminal case against Wiley without costs by order entered on December 6, 2019.

¶11 The trial court after the hearing granted Defendants' motion for summary judgment and denied Plaintiff's motion for summary judgment. In its order filed April 25, 2022, the trial court states, "That despite [Wiley's] dispute of Defendants' Undisputed Material Fact No. 6, there is no substantial controversy as to any material fact issue . . . ." The court found that, although "'Article 2'[] is not one hundred percent accurate," it "is a fair abridgement of the occurrence that was reported in the arrest affidavit" and "is therefore a privileged communication."

¶12 Three days later, Wiley filed a motion to reconsider asserting the trial court made findings of fact in its ruling and abused its discretion by doing so. Wiley also argued, pursuant to this Court's holding in Nelson v. American Hometown Publishing, Inc., 2014 OK CIV APP 57, ¶ 37, 333 P.3d 962, that when the issue is whether a communication is privileged pursuant to the fair reporting privilege, "the question of whether the report was fair, accurate and complete remains a fact question to be determined."

¶13 The trial court overruled Wiley's motion to reconsider. Wiley appeals both decisions by the trial court.

STANDARD OF REVIEW

¶14 "A 'motion to reconsider' does not technically exist within the statutory nomenclature of Oklahoma practice and procedure." Smith v. City of Stillwater, 2014 OK 42, ¶ 10, 328 P.3d 1192. If a motion to reconsider is timely filed, a court may regard it "as one for new trial under 12 O.S. 2011 § 651 (if filed within ten (10) days of the filing of the judgment, decree, or appealable order)," or it can treat it as "a motion to modify or to vacate a final order or judgment under the terms of 12 O.S. 2011 §§ 1031 and 1031.1 (if filed after ten (10) days but within thirty (30) days of the filing of the judgment, decree, or appealable order)." Fox v. Mize, 2018 OK 75, ¶ 5, 428 P.3d 314. Wiley filed his motion to reconsider within 10 days of the trial court's order granting summary judgment in Defendants' favor, and we will regard his motion as one for new trial.

¶15 "A motion for new trial is addressed to the sound discretion of the trial court." Capshaw v. Gulf Ins. Co., 2005 OK 5, ¶ 7, 107 P.3d 595. But "[w]here, as here, our assessment of the trial court's exercise of discretion in denying . . . a new trial rests on the propriety of the underlying grant of summary judgment, the abuse-of-discretion question is settled by our de novo review of the summary adjudication's correctness." Reeds v. Walker, 2006 OK 43, ¶ 9, 157 P.3d 100.

¶16 "Summary judgment is properly granted when there are no disputed questions of material fact and the moving party is entitled to judgment as a matter of law." Institute for Responsible Alcohol Pol'y v. State ex rel. Alcoholic Beverage Laws Enf't Comm'n, 2020 OK 5, ¶ 10, 457 P.3d 1050. "An appeal on summary judgment comes to this Court as a de novo review, as the matter presents only questions of law, not fact." Id. We assume "'plenary independent and non-deferential authority to reexamine a trial court's legal rulings.'" Id. (quoting Kluver v. Weatherford Hosp. Auth., 1993 OK 85, ¶ 14, 859 P.2d 1081).

ANALYSIS

¶17 Title 12 O.S.2021 § 1441 defines libel as "a false or malicious unprivileged publication by writing, printing, picture, or effigy or other fixed representation to the eye, which exposes any person to public hatred, contempt, ridicule or obloquy, or which tends to deprive him of public confidence, or to injure him in his occupation." (Emphasis added.) The trial court determined the publication in question was privileged pursuant to the fair report privilege. The fair report privilege "affords a qualified or conditional privilege to the media when they republish defamatory material in an account of a public or official proceeding, i.e. judicial proceedings, legislative sessions, judicial hearings, or official news conferences." Magnusson v. New York Times Co., 2004 OK 53, ¶ 10, 98 P.3d 1070. The fair report privilege's statutory counterpart is found at 12 O.S. § 1443.1, "which embodies a similar statutory privilege as a complete defense to libel." Id.

¶18 Although Wiley raises numerous issues on appeal, the essential issues are whether the trial court properly granted summary judgment in Defendants' favor and denied his motion to reconsider. In granting summary judgment in Defendants' favor, the trial court found Wiley could not establish his libel claim because their publication of Article 2 was privileged under the fair report privilege. We conclude it was error to hold that Article 2 was privileged under the fair report privilege or the statutory privilege as a substantially accurate or fair abridgment of the occurrence. Reasonable minds could certainly differ on that question, making it inappropriate for summary adjudication.

I. Common Law Fair Report Privilege

¶19 As a private figure, Wiley has to show the following to state a claim for defamation: "(1) a false and defamatory statement, (2) an unprivileged publication to a third party, (3) fault amounting at least to negligence on the part of the publisher; and (4) either the actionability of the statement irrespective of special damage, or the existence of special damage caused by the publication." Mitchell v. Griffin Television, L.L.C., 2002 OK CIV APP 115, ¶ 5, 60 P.3d 1058. Wiley claims that Article 2 contains false and defamatory statements that were not found in court filings including that "FBI agents seized several electronic devices with [child pornography] images on them" and that he was released on $15,000 bond. In response to Defendants' motion for summary judgment, Wiley presented deposition testimony from Jarred Burk that these statements contained false information.

¶20 The trial court granted summary judgment to Defendants after finding Wiley could not satisfy the second element--an unprivileged publication to a third party. The trial court concluded Defendants' publication of Article 2 was privileged under the fair report privilege.

¶21 In Wright v. Grove Sun Newspaper Co., Inc., 1994 OK 37, ¶ 8, 873 P.2d 983, the Oklahoma Supreme Court set out the elements of the fair report privilege with the aid of the Restatement (Second) of Torts:

The elements of the common-law fair report privilege, drawn from the seventeenth and eighteenth century English developments, are defined in the RESTATEMENT (SECOND) OF TORTS § 611. The text of that section is:

"The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported." [Emphasis added.]

The privilege is not conditioned upon the truth or falsity of the reported material, the character of the defamed person, nor on the newsworthiness of the event; rather, its applicability is determined by the nature of the occasion at which the republished material was secured for news coverage. The critical occasion here is the district attorney's news conference--a legitimate activity of his office, open to the public and held for the purpose of addressing a matter of general concern to the community. As the privilege is qualified, its abuse and loss would occur if the newspaper does not accurately and fairly republish that which was gathered from a public meeting, or if the republished material is not of general public interest.

(Footnotes omitted.)

¶22 Key to the instant case is the loss of the privilege due to a failure by the news source to "accurately and fairly republish that which was gathered from a public meeting." Id. Comment f. to Restatement (Second) of Torts § 611 states:

f. Accuracy and fairness of report. The rule stated in this Section requires the report to be accurate. It is not necessary that it be exact in every immaterial detail or that it conform to that precision demanded in technical or scientific reporting. It is enough that it conveys to the persons who read it a substantially correct account of the proceedings.

Not only must the report be accurate, but it must be fair. Even a report that is accurate so far as it goes may be so edited and deleted as to misrepresent the proceeding and thus be misleading. Thus, although it is unnecessary that the report be exhaustive and complete, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression to those who hear or read it, as for example a report of the discreditable testimony in a judicial proceeding and a failure to publish the exculpatory evidence, or the use of a defamatory headline in a newspaper report, qualification of which is found only in the text of the article. The reporter is not privileged under this Section to make additions of his own that would convey a defamatory impression, nor to impute corrupt motives to any one, nor to indict expressly or by innuendo the veracity or integrity of any of the parties.

(Emphasis added.)

¶23 One of the admitted inaccuracies at issue involves Article 2's claim that an FBI agent seized from Wiley several electronic devices with hundreds of images of child pornography on them. Specifically, the Affidavit for Arrest for Wiley from Detective Kim Morton states that when the FBI was "conducting an online investigation on the Bit Torrent network for offenders sharing child pornography," an FBI agent "initiated an investigation for a device at IP address 24.49.218.178 because it was specifically associated with a torrent that file references 689 files, at least one of which was identified as being a file of investigative interest to child pornography investigations." The agent successfully downloaded 574 files directly from that IP address between February 6, 2017, and February 7, 2017. After conducting research, the agent submitted an administrative subpoena to Fidelity Communications, who "identified the subscriber as being Ernest H. Wiley with the subscribers [sic] address as 7005 NW Baldwin Avenue, Lawton, OK 73505."

On March 23, 2017, Detective Morton met with FBI Agent Cris Lang, regarding an individual who resides in Lawton and is in possession of child pornography. Agent Lang turned over a packet of information to Detective Morton regarding this individual.

. . . .
On March 24, 2017, Detectives with the Lawton Police Department Special Operations Unit executed a search warrant at 7005 NW Baldwin. [Wiley] was not at the residence at the time the search warrant was executed. Numerous electronic devices were removed from the residence and all were submitted to OSBI for forensic examinations regarding child pornography.

. . . .
During the extraction review of devices removed from [Wiley's] residence, Detective Morton was able to locate another video depicting a nude infant. This was in addition to the hundreds of images originally located by the FBI.

The felony warrant lists Wiley's bond as being set at $50,000. The information alleges Wiley committed the crime of Aggravated Possession of Child Pornography.

¶24 Again, Article 2 states:

A Lawton man sought by police for possession of child pornography will appear in court next month.

According to court records, 52-year-old [Wiley] was arrested Thursday. Authorities say an IP address linked to his home was connected to hundreds of images of child pornography--and FBI agents seized several electronic devices with the images on them.

Wiley faces charges of aggravated possession of child pornography, and is currently out on a 15-thousand dollar bond. . . .

¶25 In Nelson, the plaintiffs alleged a newspaper incorrectly listed their address as the address of a registered sex offender. Nelson, 2014 OK CIV APP 57, ¶ 2. On the issue of the fair report privilege, we held:

If we assume the published information is of public concern and could be said to have resulted from judicial or other official proceedings and therefore constitutes "a report" subject to the fair report privilege, the question of whether the report was fair, accurate and complete remains a fact question to be determined. Stewart v. NYT Broadcast Holdings, LLC, 2010 OK CIV APP 89, ¶ 19, 240 P.3d 722 ("Whether the reports were substantially accurate presented a question for the jury to determine.").

Id. ¶ 37.

¶26 No one argues here that the report in question (Article 2) was "accurate and complete"--we agree with the trial court that it was not "accurate and complete" and is therefore not privileged on this basis. But the trial court did find Article 2 was "a fair abridgment of the occurrence that was reported in the arrest affidavit," the common law fair report privilege applied, and it was therefore privileged and could not be defamatory. We conclude the trial court erred in making this finding.

¶27 In Cobb v. Oklahoma Publishing Co., 1914 OK 69, ¶ 5, 140 P. 1079, the Oklahoma Supreme Court stated:

[W]here there is no dispute as to the circumstances under which a publication is made, that is, where there is no dispute as to what the publication was, what it was about, and who made it, or where the language in the publication is plain and unambiguous, it is a question of law for the court to determine whether or not such publication was privileged.

See also Crittendon v. Combined Commc'ns Corp., 1985 OK 111, ¶ 9, 714 P.2d 1026 (holding the trial court erred in submitting to the jury the issue of whether a communication was privileged where "the content of the publications, who made it and what it was about [were] not in dispute"). In Cobb, the Court explained: "'Where the report is a verbatim account of what took place at the trial, and differs so little that no reasonable man could say that what was omitted could affect the minds of the jury, it is the duty of the court to pronounce the report privileged."' Cobb, 1914 OK 69, ¶ 9 (quoted citation omitted).

¶28 This rule, however, does not apply where there are controverted facts about whether the report was fair and true. "'[I]f the question of the fairness of the report is capable of different conclusions, the question of privilege is for the jury."' Id. ¶ 9 (quoted citation omitted). This was not a minor erratum because incorrect material factual extrapolations were inserted in Article 2 which were not contained in the documents on which the author relied. Where, as here, a trial court concludes that the publication is not accurate, and reasonable minds could differ regarding whether the report and its extrapolations were fair and accurate, the question must be left for the jury to decide.

II. Statutory Privilege

¶29 The second and narrower is a statutory privilege found at 12 O.S.2021 § 1443.1, which provides a publication is privileged if it is a fair and true report of a proceeding authorized by law. Gaylord Ent. Co. v. Thompson, 1998 OK 30, ¶¶ 28-29, 958 P.2d 128 (footnotes omitted).

¶30 Title 12 O.S.2021 § 1443.1 provides:

A. A privileged publication or communication is one made:
First. In any legislative or judicial proceeding or any other proceeding authorized by law;
Second. In the proper discharge of an official duty;
Third. By a fair and true report of any legislative or judicial or other proceeding authorized by law, or anything said in the course thereof, and any and all expressions of opinion in regard thereto, and criticisms thereon, and any and all criticisms upon the official acts of any and all public officers, except where the matter stated of and concerning the official act done, or of the officer, falsely imputes crime to the officer so criticized.
B. No publication which under this section would be privileged shall be punishable as libel.

(Emphasis added.)

¶31 In Gaylord, 1998 OK 30, ¶ 28, the Supreme Court explained that the privilege set out in § 1443.1:

protects from civil liability the publication of (a) an accurate account of judicial, legislative or other proceedings authorized by law, as well as (b) opinions and criticisms upon the official proceeding. The statutory privilege's fair-report component protects the republication of accurate accounts of official action or proceedings, even though the reports may contain defamatory statements. The historical antecedents of this affirmative defense lie in the common law's fair-report privilege. The statutory comment-and-criticism privilege, on the other hand, affords legal immunity for the expression of opinion on matters relating to official proceedings. The defense of fair comment is predicated upon the principle that the interests of society are furthered through a free discussion of public affairs and matters of public interest. The statutory privilege's underlying rationale is that if any member of the public were present, he (or she) might see and hear the statements made at a public proceeding, so that "the reporter is merely a substitute for the public eye."

(Footnotes omitted.) The Court noted the "statutory privileges are more narrow in scope than their common-law counterparts" because they are restricted "to republications in the course of official action or proceedings, whereas the common-law privilege extends to communications on matters of public interest." Id. ¶ 29. But both "privileges provide the media with a complete defense to libel on matters pertaining to official proceedings." Id.

¶32 The statutory fair comment-and-criticism privilege does not apply because Article 2 does not contain or express opinion or criticism. For the privilege protection to apply pursuant to § 1443.1, the publication must be "a fair and true report of any legislative or judicial or other proceeding," that is, it must be accurate.

¶33 The conclusion that this publication was a fair and accurate abridgment of the events in question in this case is far from established without dispute. We must agree with Wiley that even if we assume the published information in Article 2 came from a judicial proceeding, the question of whether the abridgement was "fair, accurate and complete remains a fact question to be determined." Nelson, 2014 OK CIV APP 57, ¶ 37. With material issues of fact in dispute, we conclude the trial court erred when it granted Defendants judgment as a matter of law based on privilege.[3]

CONCLUSION

¶34 We conclude the trial court abused its discretion in denying Wiley's motion for new trial because it erred in granting Defendants judgment as a matter of law. We reverse the trial court's summary judgment in Defendants' favor and its subsequent denial of Wiley's motion for new trial and remand for further proceedings in accordance with this Opinion.

¶35 REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.

BARNES, V.C.J., concurs, and HIXON, J., dissents.

FOOTNOTES

[1] Wiley reached settlements with other defendants initially named in the lawsuit, including Fidelity Communications, Co., Cable One, Inc, and Brian Alldredge. At the hearing on the motion for summary judgment, counsel for Wiley explained that XYZ Corporation "was a place holder in case the Gray Television Inc., entity, d/b/a KSWO TV for whatever reason was an incorrect or improper party." It does not appear that XYZ was ever served in this case.

[2] As support for his motion for summary judgment, Wiley submits a portion of the transcript from the criminal trial revealing a stipulation that "[t]he OSBI report shows that there was no child porn found on the computers that were reviewed."

[3] We reject Wiley's assertion that the trial court violated Rule 2.2 of the Oklahoma Code of Judicial Conduct which states, "A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially." Oklahoma Code of Judicial Conduct Rule 2.2, 5 O.S.2021, ch. 1, app. 4. Nothing in the record shows that the trial court failed to act fairly and impartially.

 

 

HIXON, J., dissenting:

¶1 The issue on appeal is whether the trial court erred in granting Defendants summary adjudication on the ground that Article 2 was privileged as a matter of law under the common law fair report privilege. I respectfully dissent to the Majority's conclusion that this issue is one of fact for the jury in this case and would affirm the trial court's ruling that Article 2 is privileged.

¶2 Briefly, the common law fair report privilege, taken from the Restatement (Second) of Torts § 611, provides the publication of defamatory matter is privileged, whether the publication is true or false, if it is a report of an official proceeding or of public meeting that deals with a matter of public concern and, "the report is accurate and complete or a fair abridgment of the occurrence reported." Wright v. Grove Sun Newspaper Co., 1994 OK 37, ¶ 8, 873 P.2d 983 (citing Restatement (Second) of Torts § 611). See Magnusson v. New York Times Co., 2004 OK 53, ¶ 10, 98 P.3d 1070 (the common law fair report privilege "affords a qualified or conditional privilege to the media when they republish defamatory material in an account of a public or official proceeding, i.e. judicial proceedings, legislative sessions, judicial hearings, or official news conferences.").

¶3 In the present case, the trial court found that while Article 2 was not 100% accurate, it was "a fair abridgment of the occurrence that was reported in the arrest affidavit," and therefore, the common law privilege applied. The Majority holds this was error, asserting whether the privilege applies is a question of fact for the jury because reasonable minds could differ whether "the report and its extrapolations were fair and accurate." The Majority relies on the following language from Cobb v. Oklahoma Publ. Co., 1914 OK 69, ¶ 9, 140 P. 1079: "if the question of the fairness of the report is capable of different conclusions, the question of privilege is for the jury." (citation omitted). In Cobb, however, the Court was addressing whether the statutory privilege found in 12 O.S. § 1443.1 still applied to a publication because of certain additions by the author. Specifically, the article in question contained a purported excerpt from a brief filed by the attorney general regarding an alleged conspiracy to defraud Indian minors of their allotted lands, as well as the author's commentary on the matter Id. at ¶ 5.

¶4 The Court set out the long-standing rule that "where there is no dispute as to what the publication was, what is was about, and who made it, or where the language in the publication is plain and unambiguous, it is a question of law for the court to determine whether or not such publication was privileged." Id. Regarding the article's extract from the attorney general's brief, the Court stated the publication of the extract "comes clearly within the third subdivision of our statute, and was a privileged publication, provided it be a fair and true report, not maliciously made, and did not, by independent comment, falsely impute crime to plaintiff." Id. at ¶ 9. However, the Court added:

[T]he article in question included not only the extract above, but included also a general and rather lengthy comment on alleged conditions existing on the east side of the state . . . the issue arose as to whether the conditions imposed by statute had been violated, and out of such issue arose the questions, whether the report was fair, whether the publication taken as a whole was malicious, and whether the plaintiff was falsely accused of crime. These were issues of fact to be determined from the evidence by the jury.

Id. (emphasis added). In the present case, Article 2 does not include any commentary, and this language from Cobb is inapplicable.

¶5 As reflected in Cobb and more recent cases, it is well-established that it is a question of law whether the common law privilege applies if the circumstances of the publication are not in dispute. In Price v. Walters, 1996 OK 63, 918 P.2d 1370, the Court reiterated the "well-settled rule" stated above that where the circumstances of a publication are not in dispute (i.e., what the publication was, what it was about, and who made it, or where the language in the publication is plain and unambiguous), it is a question of law for the trial court to determine whether the publication was privileged. Id. at ¶ 26 (citing Crittendon v. Combined Com'ns Corp., 1985 OK 111, ¶ 8, 714 P.2d 1026, quoting Cobb, 1914 OK 69). The dissents in Price disagreed, asserting a question of fact existed if reasonable persons could disagree whether the publication was fair and true. Id. (Wilson, J., dissenting, at ¶ 3). Price has not been overturned, and the majority's holding remains good law.

¶6 Here, the circumstances of the publication of Article 2, meaning its content, who made it, and what it was about (the arrest affidavit and other court filings) are not in dispute. Thus, in accordance with Supreme Court precedent, the determination of whether the privilege applied was a question of law for the trial court.

¶7 Additionally, the trial court ultimately found that while Article 2 was not 100% accurate, it was "a fair abridgment of the occurrence that was reported in the arrest affidavit." This is also a question of law for the Court on appeal, which we review de novo.

¶8 In determining whether Article 2 was a fair abridgement of the court filings, it is well-established that it is unnecessary that a report be exact in every detail. It is enough that it conveys to the reader "a substantially correct account of the proceeding," or that the report's "gist" is the same. Crittendon, 1985 OK 111, ¶¶ 15-6. Slight inaccuracies of expression "are immaterial provided that the defamatory charge is true in substance." Price, 1996 OK 63, ¶ 33 (quotation omitted).

¶9 Wiley contends Article 2 was not substantially accurate for three reasons: 1) because it incorrectly stated the FBI seized several electronic devices from his home rather than the Lawton Police Department; 2) because it incorrectly stated he was out on a $15,000 bond rather than a $50,000 bond; and 3) because it incorrectly states images of child pornography were retrieved from the electronic devices seized from his home.

¶10 Wiley is correct that Article 2 misstates it was the FBI who seized the devices and that he was out on a $15,000 bond. However, these minor errors do not render Article 2 substantially misleading. The arrest affidavit reflects that while the images were seized by the Lawton Police Department, the FBI initiated the investigation.[1] Furthermore, the felony warrant shows that a bond was set, albeit at a higher amount than that stated in Article 2. The "gist" of Article 2's report was that the FBI was involved in the investigation, and Wiley was out on bond. Thus, it conveyed a fair and true and a substantially correct account of the court filings on these matters.

¶11 Wiley also argues that Article 2 was misleading because it inaccurately suggested hundreds of pornographic images were found on the devices seized from his home.

¶12 The arrest affidavit provides, in part:

On March 23, 2017, Detective Morton met with FBI Agent Chris Lang, regarding an individual who resides in Lawton and is in possession of child pornography. Agent Lang turned over a packet of information to Detective Morton regarding this individual. [] On March 24, 2017, Detectives with the Lawton Police Department Special Operations Unit executed a search warrant. . . . [Wiley] was not at the residence at the time the search warrant was executed. Numerous electronic devices were removed from the residence and all were submitted to OSBI for forensic examinations regarding child pornography. [] During the extraction review of devices removed from [Wiley's] residence, Detective Morton was able to locate another video depicting a nude infant. This was in addition to the hundreds of images originally located by the FBI.

¶13 As noted above, the arrest affidavit also provides an FBI agent downloaded hundreds of child pornography files directly from an IP address, for which Wiley was identified as the subscriber.

¶14 Article 2 states:

A Lawton man sought by police for possession of child pornography will appear in court next month.

According to court records, 52-year-old [Wiley] was arrested Thursday. Authorities say an address linked to his home was connected to hundreds of images of child pornography--and FBI agents seized several electronic devices with the images on them.

Wiley faces charges of aggravated possession of child pornography, and is currently out on a 15-thousand dollar bond. . . .

¶15 Both the arrest affidavit and Article 2 may be fairly read to suggest the same thing--that in addition to the nude infant video found on the device seized from Wiley's home, the hundreds of images originally located by the FBI were connected to Wiley and found on Wiley's devices. The affidavit contains no indication of what was later learned--that the images were not found on Wiley's computer, and the IP address was not Wiley's in the first place. That information gives a different context to the language in the arrest affidavit appearing to indicate that hundreds of images were found on Wiley's computer, which cannot be gleaned from the affidavit itself. However, the issue here is not whether the information in Article 2 may later have been determined to be incorrect because the affidavit itself was incorrect. In fact, the privilege at issue specifically addresses the republication of false or defamatory information. The issue is whether Article 2 was a fair abridgment of the occurrence that was reported in the arrest affidavit, and therefore, a privileged publication under the common law fair report privilege. I would hold that it is, and that the trial court correctly ruled as a matter of law that the privilege applied.

FOOTNOTES

[1] Moreover, the arrest affidavit provides an FBI agent, who was part of an online investigation into offenders, successfully downloaded hundreds of child pornography files directly from a specific IP address, and Wiley was identified as that address's subscriber. It also states an FBI agent met with Detective Morton with the Lawton Police Department and turned over a packet of information from their investigation of Wiley.

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Civil Appeals Cases

 
Cite
Name
Level

 
2002 OK CIV APP 115, 60 P.3d 1058, 
MITCHELL v. GRIFFIN TELEVISION, L.L.C.
Discussed

 
2010 OK CIV APP 89, 240 P.3d 722, 
STEWART v. NYT BROADCAST HOLDINGS, L.L.C.
Discussed

 
2014 OK CIV APP 57, 333 P.3d 962, 
NELSON v. AMERICAN HOMETOWN PUBLISHING, INC.
Discussed at Length

Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1993 OK 85, 859 P.2d 1081, 64 OBJ 2009, 
Kluver v. Weatherford Hosp. Authority
Discussed

 
1914 OK 69, 140 P. 1079, 42 Okla. 314, 
COBB v. OKLAHOMA PUBLISHING CO.
Discussed at Length

 
1994 OK 37, 873 P.2d 983, 65 OBJ 1328, 
Wright v. Grove Sun Newspaper Co., Inc.
Discussed at Length

 
2004 OK 53, 98 P.3d 1070, 
MAGNUSSON v. NEW YORK TIMES CO. d/b/a KFOR
Discussed at Length

 
2005 OK 5, 107 P.3d 595, 
CAPSHAW v. GULF INSURANCE COMPANY
Discussed

 
2006 OK 43, 157 P.3d 100, 
REEDS v. WALKER
Discussed

 
1996 OK 63, 918 P.2d 1370, 67 OBJ 1818, 
Price v. Walters
Discussed at Length

 
2014 OK 42, 328 P.3d 1192, 
SMITH v. CITY OF STILLWATER
Discussed

 
2018 OK 75, 428 P.3d 314, 
FOX v. MIZE
Discussed

 
2020 OK 5, 457 P.3d 1050, 
THE INSTITUTE FOR RESPONSIBLE ALCOHOL POLICY v. STATE ex rel. ALCOHOLIC BEVERAGE LAWS ENFORCEMENT COMM.
Discussed

 
1998 OK 30, 958 P.2d 128, 69 OBJ 1404, 
GAYLORD ENTERTAINMENT CO. v. THOMPSON
Discussed at Length

 
1985 OK 111, 714 P.2d 1026, 
Crittendon v. Combined Communications Corp.
Discussed at Length

Title 12. Civil Procedure

 
Cite
Name
Level

 
12 O.S. 651, 
New Trial - Definition - Causes for
Cited

 
12 O.S. 1031, 
District Court, Power to Vacate or Modify its Judgments, When
Cited

 
12 O.S. 1441, 
Definition of Libel
Cited

 
12 O.S. 1443.1, 
Privileged Communication Defined - Exemption from Libel
Discussed at Length

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA